

**FILE**
IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON
DATE JUN 11 2015

CHIEF JUSTICE

This opinion was filed for record
at 8:00 Am on June 11, 2015

for Ronald R. Carpenter
Supreme Court Clerk

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

|  |  |  |  |
|---|---|---|---|
| STATE OF WASHINGTON, | ) | No. 90355-7 | |
| | ) | | |
| Appellant, | ) | | |
| | ) | | |
| v. | ) | EN BANC | |
| | ) | | |
| S.J.C., | ) | | |
| | ) | Filed: JUN 11 2015 | |
| Respondent. | ) | | |

YU, J.—This case presents the question of whether article I, section 10[1] of the Washington Constitution requires the court to apply the *Ishikawa* factors when a former juvenile offender has satisfied the statutory requirements of former RCW 13.50.050 (2011) to seal his or her juvenile court record. *See Seattle Times Co. v. Ishikawa*, 97 Wn.2d 30, 37-39, 640 P.2d 716 (1982). Based on experience and logic, we affirm the juvenile court's holding that it does not. *See State v. Chen*, 178 Wn.2d 350, 356, 309 P.3d 410 (2013); *State v. Sublett*, 176 Wn.2d 58, 73, 292 P.3d 715 (2012) (C. Johnson, J., lead opinion); *id.* at 94 (Madsen, C.J., concurring).

---

[1]"Justice in all cases shall be administered openly, and without unnecessary delay."

Because it is undisputed that S.J.C. met all the statutory requirements, we affirm the juvenile court's order sealing his juvenile court record.

## FACTS AND PROCEDURAL HISTORY

In January 2008, S.J.C. pleaded guilty to two counts of fourth degree assault with sexual motivation for offenses he committed at age 13. At S.J.C.'s disposition hearing in February 2008, the juvenile court ordered two years of community supervision and imposed other conditions such as regular school attendance, sexual deviancy treatment, and payment of a victim penalty assessment.

After completing all of his conditions, in December 2011, S.J.C. moved to vacate his adjudication and seal his juvenile record under former RCW 13.50.050. Under the statute, "[t]he official juvenile court file of any alleged or proven juvenile offender shall be open to public inspection, unless sealed pursuant to subsection (12) of this section." Former RCW 13.50.050(2). The relevant portion of subsection (12) provided:

> (b)     The court shall not grant any motion to seal records for class B, C, gross misdemeanor and misdemeanor offenses and diversions made under subsection (11) of this section unless:
>
> (i)     Since the date of last release from confinement, including full-time residential treatment, if any, entry of disposition, or completion of the diversion agreement, the person has spent two consecutive years in the community without being convicted of any offense or crime;
>
> (ii)     No proceeding is pending against the moving party seeking the conviction of a juvenile offense or a criminal offense;

(iii)   No proceeding is pending seeking the formation of a diversion agreement with that person;

(iv)   The person is no longer required to register as a sex offender under RCW 9A.44.130 or has been relieved of the duty to register under RCW 9A.44.143 if the person was convicted of a sex offense; and

(v)   Full restitution has been paid.

*Id.*

The State opposed the motion, conceding that S.J.C. met the statutory requirements but arguing that article I, section 10 also required S.J.C. to show that sealing was justified under an *Ishikawa* analysis. The juvenile court granted S.J.C.'s motion and held that *Ishikawa* did not apply. We accepted direct review.

## ISSUE

When sealing juvenile court records pursuant to former RCW 13.50.050, does article I, section 10 require the juvenile court to conduct an *Ishikawa* analysis in addition to finding the statutory requirements are met?

## ANALYSIS

Whether an *Ishikawa* analysis is necessary depends on whether article I, section 10 applies to the statutory sealing of juvenile court records. Whether article I, section 10 applies depends on application of the experience and logic test. *In re Det. of Morgan*, 180 Wn.2d 312, 325, 330 P.3d 774 (2014). Neither experience nor logic indicates that article I, section 10 applies when sealing juvenile court records pursuant to a specific statutory provision.

A.    A brief history of juvenile justice

We must first take into account the history of juvenile justice. We do not presume to set forth an authoritative historical treatise, but a brief discussion is needed to provide context for our analysis of the issue presented. This discussion reveals a centuries-old effort to balance the competing concerns where a juvenile is viewed as needing reformation and rehabilitation, but is not appropriately subjected to adult criminal proceedings and punishments. To balance these unique concerns, the law has constructed a constitutional wall around juveniles, maintaining its integrity through a continuous process of refining its contours and repairing its cracks.

Within the English common law tradition, juvenile law did not begin to take shape until juveniles began to be viewed as a distinct class of individuals, rather than chattels incident to adult domestic relations or as simply members of the general population. Prior to the 1600s, juveniles were not viewed as having an identity separate from their parents until they were between five and seven years old. THOMAS J. BERNARD, THE CYCLE OF JUVENILE JUSTICE 50-52 (1992). Between 1600 and 1800, the basic contours of the modern concept of juvenility solidified— the juvenile is a "potential adult" but not yet fully formed. *Id.* at 52, 54.

Some early examples of juvenile-specific law may be found in the English Chancery Courts. In cases of orphaned juveniles with inherited estates, the

Chancery Court would exercise equitable authority to manage both the person and the estate of the juvenile in the name of the sovereign. *Id.* at 69; *Weber v. Doust*, 84 Wash. 330, 333, 146 P. 623 (1915). Following the Revolutionary War, sovereignty shifted from the crown to the people, but the idea that the sovereign had inherent equitable authority over the persons and estates of juveniles continued. *Weber*, 84 Wash. at 333. This authority was justified by the belief that "'it is indispensably necessary to protect the persons and preserve the property of those who are unable to protect and take care of themselves.'" Julian W. Mack, *The Juvenile Court*, 23 HARV. L. REV. 104, 105 (1909) (quoting *Cowles v. Cowles*, 3 Gilman 435 (1846)).

While orphaned juveniles with substantial property interests were thus given special attention, juveniles charged with criminal offenses were tried in ordinary criminal courts. The age of the offender, however, was still a relevant factor in both law and fact. Under English common law, juveniles under seven years old were legally incapable of committing a crime; there was a rebuttable presumption that those between 7 and 14 years old were not criminally responsible and a rebuttable presumption that those between 14 and 21 years old were. BERNARD, *supra*, at 29 (citing 4 WILLIAM BLACKSTONE, COMMENTARIES *23). Moreover, prosecutors, juries, and judges were sometimes reluctant to apply the letter of the law to juvenile offenders and sought to mitigate the harshness of adult criminal justice with charging, conviction, and sentencing decisions. *Id.* at 35, 61; ANTHONY

M. PLATT, THE CHILD SAVERS 186 (1969). The options were often extreme—either release the juvenile and risk the possibility that the juvenile will recidivate due to the lack of meaningful consequences, or confine the juvenile to the penitentiary with adult offenders and risk the possibility that the juvenile will be trained and encouraged to become an adult criminal due to the influence of fellow prisoners. BERNARD, *supra*, at 34-35, 61, 63.

Beginning in the 19th century, many jurisdictions sought to create other options. In an effort to separate juvenile offenders from the corrupting influence of adult criminals, some states provided that juveniles charged with crimes could be tried on a separate docket from adult criminal cases. PLATT, *supra*, at 9. Some states also established separate institutions for juveniles who were found to have violated the criminal laws or were expected to do so if not institutionalized and reformed, so the juvenile might be "snatched from a course which must have ended in confirmed depravity." *Ex Parte Crouse*, 4 Whart. 9, 11 (Pa. 1839); *see* LAWS OF 1891, ch. 103, §§ 1-2, at 195-96; *In re Habeas Corpus of Mason*, 3 Wash. 609, 612-13, 28 P. 1025 (1892). Such institutionalization was sometimes held unconstitutional as depriving juveniles of their liberty without due process of law, *People v. Turner*, 55 Ill. 280, 287-88 (1870), but carefully drafted legislation that consciously avoided the approach of the criminal law was held to remedy the problem, *In re Petition of Ferrier*, 103 Ill. 367, 370-71 (1882). The intention,

though not always the actual practice, was to protect the interests of all juveniles and not merely those with large estates as the Chancery Courts did.

The combination of separate trials and separate institutions led quite naturally to the formal establishment of separate court divisions devoted entirely to juvenile issues. Washington first adopted this approach in 1905. LAWS OF 1905, ch. 18. Matters on the juvenile calendar included juveniles charged with violating criminal laws and juveniles facing a range of significant social, economic, and familial problems. *Id.* § 1. The juvenile court's broad scope was based on the belief that most juvenile offenders have more in common with a dependent or neglected child than with an adult criminal. *Id.* § 12; Mack, *supra*, at 107.

Washington juvenile court legislation was revisited and modified several times over the next few years, culminating in comprehensive juvenile court legislation enacted in 1913. The 1913 laws solidified the distinction between a juvenile "dependent" and a juvenile "delinquent." LAWS OF 1913, ch. 160, § 1. "Dependent" juveniles suffered from social, economic, and familial problems, while juveniles who violated state and local criminal laws were designated as "delinquents." *Id.* The juvenile court judge had the discretion to transfer the case of a juvenile delinquent to the ordinary criminal court. *Id.* § 12. So long as the juvenile court retained the case, however, "[a]n order of court adjudging a child dependent or delinquent under the provisions of this act shall in no case be deemed

a conviction of crime." *Id.* § 10. This court observed that the juvenile court is not intended "to restrain criminals to the end that society may be protected and the criminal perchance reformed; it is to prevent the making of criminals." *In re Delinquency of Lundy*, 82 Wash. 148, 151, 143 P. 885 (1914), *disagreed with on other grounds by In re Carson*, 84 Wn.2d 969, 971-72, 530 P.2d 331 (1975).

After these early legislative efforts, there were few significant changes to the juvenile justice system until the mid-1970s. In 1977, the legislature undertook a major overhaul of the juvenile justice statutes, providing much more specific and delineated substantive and procedural guidelines for juvenile courts. LAWS OF 1977, 1st Ex. Sess., ch. 291. The law was divided into four sections, two of which are relevant here: provisions relating to juvenile courts and records generally, *id.* §§ 1-15, and provisions specific to juveniles who had violated criminal laws, *id.* §§ 55-81. The latter set of provisions constitutes the Juvenile Justice Act of 1977 (JJA), *id.* § 55(1), and the juveniles adjudicated under its authority were termed "juvenile offenders," *id.* § 56(11).

The legislature described its intent in enacting the JJA as twofold: to establish "a system capable of having primary responsibility for, being accountable for, and responding to the needs of youthful offenders" while ensuring that juveniles will "be held accountable for their offenses." *Id.* § 55(2). With the JJA, "the legislature has changed the philosophy and methodology of addressing the

8

personal and societal problems of juvenile offenders, but it has not converted the procedure into a criminal offense atmosphere totally comparable to an adult criminal offense scenario." *State v. Lawley*, 91 Wn.2d 654, 659, 591 P.2d 772 (1979). That remains true following further legislative refinements since the JJA was first enacted. *State v. Chavez*, 163 Wn.2d 262, 267-68, 180 P.3d 1250 (2008).

The history of juvenile justice is a history of bringing together long-standing tenets of common law with continuously evolving notions of criminology and the nature of juvenile development. While further developments will undoubtedly occur, the current contours of Washington's juvenile justice system today reflect over a century of our lawmakers' best efforts to carefully balance the interests at stake in the context of juvenile justice. These efforts have built a constitutional wall around juvenile justice; and while the dimensions of this wall have changed, its structural integrity has not.

B.     Juvenile court records that meet statutory sealing requirements have not historically been open to the press and the general public

To determine whether experience supports the application of article I, section 10 (and thus the *Ishikawa* factors) to statutory motions to seal juvenile records, we must determine """"whether the place and process have historically been open to the press and general public."""" *Morgan*, 180 Wn.2d at 325 (quoting *Sublett*, 176 Wn.2d at 73 (quoting *Press-Enter. Co. v. Superior Court*, 478 U.S. 1, 8, 106 S. Ct. 2735, 92 L. Ed. 2d 1 (1986))). As in the case of juvenile justice

9

generally, the openness of juvenile court records has evolved over time, but there are certain consistent themes showing that article I, section 10 and *Ishikawa* do not apply.

The legislature has always treated juvenile court records as distinctive and as deserving of more confidentiality than other types of records. This court has always given effect to the legislature's judgment in the unique setting of juvenile court records. Our approach has been consistent with the approaches of other states and Supreme Court jurisprudence historically, and remains so today. Washington's approach to juvenile court records is further supported by the views of professional organizations and a variety of commentators.

1. The focus of our historical analysis is on the juvenile courts

A threshold question in any historical analysis is at what point in history the analysis should begin. The State urges us to "begin [our] historical analysis in a time when juveniles were prosecuted in the same courts as adults." Br. of Appellant at 11. It is certainly true that there were no standards or procedures particular to juvenile courts before juvenile courts existed. From the colonial period through the 19th century, "[j]uveniles are tried in adult courts as adults. There is little recordkeeping, but to the extent that court records exist, they are open to the public." U.S. DEP'T OF JUSTICE, BUREAU OF JUSTICE STATISTICS, PRIVACY AND JUVENILE JUSTICE RECORDS: A MID-DECADE STATUS REPORT app. at

33 (1997), *available at* http://www.bjs.gov/content/pub/pdf/PJJR.PDF (Juvenile justice timeline).

Evaluating the historical openness of juvenile court records by looking to a time when juvenile courts did not exist does little to help our analysis. *See State v. Schaaf*, 109 Wn.2d 1, 14-15, 743 P.2d 240 (1987). Where a juvenile is tried as an adult, the procedures are the same as in any criminal proceeding, as was true before juvenile courts existed. *See State v. Saenz*, 175 Wn.2d 167, 174, 283 P.3d 1094 (2012). However, a juvenile tried in juvenile court is *not* being tried in an adult criminal court and the analogy to adult criminal courts is not appropriate. *See Chavez*, 163 Wn.2d at 267-68. "If the formalities of the criminal adjudicative process are to be superimposed upon the juvenile court system, there is little need for its separate existence." *McKeiver v. Pennsylvania*, 403 U.S. 528, 551, 91 S. Ct. 1976, 29 L. Ed. 2d 647 (1971). We therefore focus on the actual situation presented—juvenile courts.

2. The legislature has always set policies specifically regarding and restricting the openness of juvenile court records

The juvenile court as a separate division of superior court is a creation of the legislature. *State v. Posey*, 174 Wn.2d 131, 136-37, 272 P.3d 840 (2012). It is therefore unsurprising that the legislature has always provided guidance on the openness of juvenile court records as a distinct class of records. While the specificity and content of this guidance has varied, the legislature has always made

11

some provision to limit public access to juvenile court records in recognition of the unique purpose of juvenile courts to rehabilitate and reintegrate youth into society. Legislation does not, of course, define the scope of constitutional protections, but it does provide us with significant information about the extent to which juvenile records have historically been open to the press and the general public.

From this State's very first juvenile court legislation, the findings of juvenile courts were distinguished from the records of other courts. LAWS OF 1905, ch. 18, § 3 ("[T]he finding of the Court shall be entered in a book, or books, to be kept for that purpose, and known as the 'Juvenile Record.'"). While there was no specific provision regarding the openness or confidentiality of juvenile court records,[2] this first legislation did explicitly provide juvenile court proceedings could not be evidence outside of juvenile court:

> A disposition of any child under this act, or any evidence given in such cause, shall not in any civil, criminal or other cause or proceeding whatever, in any court, be lawful or proper evidence against such child for any purpose whatever, excepting in subsequent cases against the same child under this act.

---

[2]It is worth noting that the Juvenile Record in these early cases apparently contained very little factual information, stigmatizing or otherwise. For instance, the early Juvenile Record from Whatcom County repeatedly recites boilerplate findings that the juvenile "is disobedient, is growing up in idleness and mendicancy, and is not receiving paternal care, and is an incorrigible person and a proper subject to be committed to the State Training School." Warrant of Commitment to State Training Sch., *State v. Taylor*, No. 149, at 210 (Whatcom County Super. Ct., Wash., Jan. 31, 1911); Warrant of Commitment to Lebanon Home Seattle, Wash., *State v. Pratt*, No. 242, at 27 (Whatcom County Super. Ct., Wash., Apr. 14, 1913). This is in sharp contrast to the modern official juvenile court file, which includes "the petition or information, motions, memorandums, briefs, findings of the court, and court orders." RCW 13.50.010(1)(b).

*Id.* § 1. Given how broadly and generally the 1905 legislation was written, this specific provision is noteworthy for its early recognition of the importance of limiting the future consequences of juvenile court decisions on the juvenile and the problem of further distribution outside of the juvenile court.

The 1913 legislation made further provisions to protect the privacy of individuals subject to juvenile court proceedings by providing that "the court shall have power to exclude the general public from the room where the hearing is had." LAWS OF 1913, ch. 160, § 10. Moreover, the investigative records of juvenile court probation officers "shall be withheld from public inspection" and "shall be destroyed at any time in the discretion of [the] judge . . . on or before the child shall arrive at the age of twenty-one years." *Id.*

Legislation between 1913 and 1977 experimented with various provisions relating to the confidentiality of juvenile court records and proceedings. To prevent the creation of a damaging police record, the legislature at one time provided that the juvenile court's permission was required before any juvenile's fingerprints or photograph could be taken. LAWS OF 1945, ch. 132, § 2. When the 1961 legislature provided for a verbatim report of juvenile court proceedings, LAWS OF 1961, ch. 302, § 5, it maintained the confidentiality of the probation officer's record and the juvenile court's discretion to destroy it, *id.* § 15.

Finally, when the legislature fully undertook the restructuring of juvenile courts in 1977, it substantially refined the appropriate level of openness at different stages of juvenile court proceedings. This refinement recognized the delicate balance needed to address the issues unique to the juvenile court context. Juvenile offender proceedings and official court files in juvenile offender proceedings were deemed presumptively open to the public. LAWS OF 1977, 1st Ex. Sess., ch. 291, §§ 10(1)(a), 68(6). However, the official juvenile court file[3] must be sealed if, at least two years after the juvenile court case is completed, the subject of the file moves to seal and has no pending charges and no other convictions or adjudications. *Id.* § 12(2). The probation counselor's records remained confidential, as were all other records not in the official juvenile court file. *Id.* §§ 10(1)(b)-(d). Further, the provision for destruction of juvenile records was expanded so the subject of a juvenile court proceeding could move to destroy *"all records pertaining to his or her case,"* rather than just the probation counselor's records. *Id.* § 12(6) (emphasis added).

Though the specific provisions have been further refined, the essential framework of the 1977 legislation remains. Under former RCW 13.50.050(2), the official court file of a juvenile offender proceeding is presumptively open unless

---

[3] "The official juvenile court file for a proceeding shall include the petition or information, motions, memorandums, briefs, findings of the court, court orders, and other reports and papers filed in juvenile court." LAWS OF 1977, 1st Ex. Sess., ch. 291, § 10(2).

sealed. The subject may move to seal his or her official juvenile court file, if specific court conditions have been met. *Id.* at (11)-(12). All other records pertaining to a juvenile offender proceeding are confidential. *Id.* at (3).

From the inception of juvenile courts in this state, the juvenile court laws have undergone a continuous process of refinement regarding the confidentiality of juvenile court records. The weighing of competing interests and policy judgments has recognized the dual purpose of holding juveniles accountable and fostering rehabilitation for reintegration into society, and it has led to the conclusion that juvenile court records should be treated as separate from, and deserving of more confidentiality than, other types of court records.

3.    This court has always given effect to statutory provisions providing enhanced confidentiality for juvenile court records

This court has never held article I, section 10 applies to juvenile records, and has always respected the legislature's judgment as to the openness of juvenile court records. This is not to say the legislature has unbridled discretion—juvenile offender proceedings are bound by the fundamental requisites of due process. U.S. CONST. amend. XIV, § 1; *In re Gault*, 387 U.S. 1, 19, 87 S. Ct. 1428, 18 L. Ed. 2d 527 (1967). But experience shows we have always recognized that the legislature is in the unique and best position to publicly weigh the competing policy interests raised in the juvenile court setting, particularly as it pertains to the openness of juvenile court records.

As discussed above, from the time of this state's first juvenile court legislation, statutes have consistently provided for distinctive treatment and enhanced confidentiality of juvenile court records. Our own precedent holds a presumption of openness is not constitutionally required because of the fundamental differences between a juvenile offender proceeding, which seeks to rehabilitate the juvenile, and an adult criminal proceeding, which seeks to deter and punish criminal behavior. *In re Welfare of Lewis*, 51 Wn.2d 193, 200, 316 P.2d 907 (1957).[4] We have repeatedly cited the juvenile court as an example of a situation in which the constitutional presumption of openness does not apply. *E.g.*, *Ishikawa*, 97 Wn.2d at 36; *Cohen v. Everett City Council*, 85 Wn.2d 385, 388, 535 P.2d 801 (1975). Rather than disturbing the careful policy judgments at issue, we have always given effect to the statutory procedures and requirements for sealing juvenile records. *See State v. T.K.*, 139 Wn.2d 320, 331, 987 P.2d 63 (1999) (holding that a former version of RCW 13.50.050 "impos[ed] a mandatory obligation to seal if a juvenile meets the statutory conditions").

In addition to giving effect to carefully drawn statutes regarding the openness of juvenile court records, we have also recognized the possibility of a statutory remedy where sealing was not otherwise available under court rule or

---

[4]*Lewis* addresses the much broader issue of whether article I, section 10 applies to juvenile offender proceedings generally. *Lewis*, 51 Wn.2d at 197-98. We are not presented here with the question of whether *Lewis* remains good law in its entirety.

*Ishikawa. Hundtofte v. Encarnación*, 181 Wn.2d 1, 10 n.2, 330 P.3d 168 (2014) (Owens, J., lead opinion). Many particular examples of carefully drawn, statutorily authorized exceptions to general rules regarding the openness of court records relate to juveniles. *Id.* at 16-17 (Madsen, C.J., concurring). Requiring an individualized showing under the *Ishikawa* factors would thus be directly contrary to this court's entire history regarding juvenile courts, in addition to every available indication of legislative intent.

4.    Washington's experience with juvenile courts reflects the national experience

If Washington were an outlier in its historical or current approach to juvenile court records, there might be reason to reconsider our own experience. However, our state's approach is (and always has been) consistent with the approaches of other jurisdictions and with Supreme Court jurisprudence, is supported by the recommendations of professional organizations, and comports with the views of commentators across the spectrum.

(a)    Washington juvenile court law has historically kept pace with other jurisdictions

Our legislature's approach has always been in step with the approaches of other state legislatures and Supreme Court jurisprudence. By 1910, there were juvenile courts or probation systems in 32 states. U.S. DEP'T OF JUSTICE, OFFICE OF JUVENILE JUSTICE & DELINQUENCY PREVENTION, JUVENILE JUSTICE: A CENTURY OF

CHANGE 2 (1999) (1999 National Report Series, Juvenile Justice Bulletin), *available at* https://www.ncjrs.gov/pdffiles1/ojjdp/178995.pdf. Twenty-one of them, including Washington, required a separate juvenile court record. Grace Abbott, *Topical Abstract of Laws Governing the Trial and Disposition of Juvenile Offenders, in* JUVENILE COURT LAWS IN THE UNITED STATES 130-31 (Hastings H. Hart ed., 1910). Sixteen jurisdictions provided juvenile court must take place in a separate room or special session of the court. *Id.* at 131. While many states did not specifically provide that the proceedings should be closed to the public, "it [was] the policy of the judges in a good many places to exclude children and adults who have no interest in the case." *Id.* at 132.

When juvenile courts began to receive focus from the Supreme Court of the United States, Washington kept pace with the changing face of juvenile law. In 1967, the Supreme Court determined that "[t]he absence of procedural rules based upon constitutional principle has not always produced fair, efficient, and effective procedures." *Gault*, 387 U.S. at 18. Therefore, juvenile offenders were entitled to fundamental due process, including sufficient notice of the charges, *id.* at 33, the right to counsel, *id.* at 41, the privilege against self-incrimination, *id.* at 55, and the right to confront and cross-examine adverse witnesses, *id.* at 57. Further, while the Court declined to find a right to appeal or impose the duty to record or transcribe

the proceedings, it indicated that this would be preferable. *Id.* at 58. Most of the practices prescribed by the Supreme Court were already in place in Washington.

At the time *Gault* was decided, Washington legislation already provided for a verified petition stating the relevant facts, LAWS OF 1913, ch. 160, § 5, and provided that when any juvenile is taken into custody, "the parent or guardian must be immediately notified," LAWS OF 1961, ch. 302, § 2. Washington case law had already determined that notice must be both timely, *In re Welfare of Petrie*, 40 Wn.2d 809, 812, 246 P.2d 465 (1952), and sufficiently detailed to notify the juvenile of the conduct supporting the petition, *Lewis*, 51 Wn.2d at 202. The juvenile was "given an opportunity to retain counsel."[5] *State ex rel. Helwig v. Superior Court*, 176 Wash. 478, 480, 29 P.2d 930 (1934). Juvenile court proceedings included witness testimony, and dispositions were not based on bare confessions. *Lewis*, 51 Wn.2d at 196-97. Finally, the legislature had already provided for the transcription of juvenile proceedings and also provided a right to appeal commitment decisions. LAWS OF 1961, ch. 302, §§ 5, 14.

Following the landmark decision in *Gault*, Washington continued to keep pace with the development of juvenile court laws. The Supreme Court held in 1970

---

[5]Although the right to counsel could be waived, this court observed that even where a juvenile case is transferred to the ordinary criminal court, "[i]t undoubtedly would be a better and more satisfactory procedure that counsel always be appointed when the defendant is a minor." *In re Habeas Corpus of Snyder*, 66 Wn.2d 115, 117, 401 P.2d 349 (1965).

19

that the standard of proof for a juvenile offender proceeding must be proof beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 368, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970). Washington had already adopted that standard by court rule. *In re Welfare of Forest*, 76 Wn.2d 84, 87, 455 P.2d 368 (1969). When the Supreme Court determined that a jury trial was not constitutionally required, the Washington Legislature was with the majority of states that had already reached the same conclusion. *McKeiver*, 403 U.S. at 548-49 & nn.7-8.

Finally, when the legislature made specific provisions for sealing of juvenile offender records in 1977, it acted on recommended standards of a joint commission of the Institute of Judicial Administration and the American Bar Association. *Seattle Times Co. v. County of Benton*, 99 Wn.2d 251, 256, 661 P.2d 964 (1983). Those recommended standards were "guideposts to the future of juvenile law" throughout the country. INST. OF JUDICIAL ADMIN. & AM. BAR ASS'N, JUVENILE JUSTICE STANDARDS: STANDARDS RELATING TO JUVENILE RECORDS AND INFORMATION SYSTEMS, at viii (1980) (ABA JUVENILE JUSTICE STANDARDS). The history of Washington juvenile court laws closely tracks the national experience and so is entitled to significant weight in our analysis.

        (b)    Former RCW 13.50.050 provides at least as much openness as the modern practices of most other jurisdictions

In addition to keeping pace with other jurisdictions historically, Washington's modern approach to the openness of juvenile court records comports

with the approach of other states. It is also supported by Supreme Court jurisprudence, which recognizes the value of some heightened confidentiality regarding juvenile offenses and the need to treat juvenile offenders differently from adult criminal defendants in some ways.

Statutory provisions for sealing, expunging, or destroying juvenile court records are the norm, rather than the exception. As of 2009, every state except Rhode Island had such statutes. Linda A. Szymanski, *Are There Some Juvenile Court Records That Cannot Be Sealed?*, 15 NCJJ SNAPSHOT, no. 4 (Apr. 2010), *available at* http://www.ncjj.org/PDF/Snapshots/2010/vol15_no4_ Recordsthatcannotbesealed.pdf (*Juvenile Court Records That Cannot Be Sealed*). It is particularly persuasive that Oregon and Indiana, upon whose constitutions our own article I, section 10 is based, have similar approaches to juvenile court records. THE JOURNAL OF THE WASHINGTON STATE CONSTITUTIONAL CONVENTION 1889, at 499 n.18 (Beverly Paulik Rosenow ed., 1962). Oregon has held juvenile court proceedings must be open, *State ex rel. Oregonian Publ'g Co. v. Deiz*, 289 Or. 277, 613 P.2d 23, 27 (1980), but still provides for sealing juvenile court records by statute, OR. REV. STAT. §§ 419A.255, .257. Indiana also has statutory provisions governing the confidentiality and release of juvenile court records. *See* IND. CODE §§ 31-39-1, -2; *State ex rel. Shelbyville Newspapers, Inc. v. Shelby Superior Court*, 396 N.E.2d 337, 340 (Ind. 1979) ("[T]here is ample justification

for the [Indiana] statutory policy of permitting the release of juvenile information only after a determination by a court of law.").

Not only is Washington in line with the national practice of providing a statutory mechanism for sealing juvenile court records, but former RCW 13.50.050 actually provides more openness than many other state statutes in certain respects. As of 2009, many states did not include Washington's provision, former RCW 13.50.050(12)(a)(v), that sealing is not allowed for certain specified offenses. *Juvenile Records That Cannot Be Sealed, supra.* Automatically nullifying a prior sealing order upon a future adjudication or conviction, as in former RCW 13.50.050(16), was the minority practice as of 2009. Linda A. Szymanski, *Can Sealed Juvenile Court Records Ever Be Unsealed or Inspected?*, 15 NCJJ SNAPSHOT, no. 5 (May 2010), *available at* http://www.ncjj.org/PDF/Snapshots/2010/vol15_no5_Sealedrecordsthatcanbeunsealed.pdf. As of 2013, Washington was "one of only eight states that has all juvenile arrest and conviction records public." Hr'g on H.B. 1651 Before the H. Early Learning and Human Servs. Comm., 63d Leg., Reg. Sess. (Feb. 12, 2013), at 51 min., 10 sec., *audio recording by* TVW, Washington State's Public Affairs Network, *available at* http://www.tvw.org.

In addition to the statutes of other jurisdictions, Supreme Court precedent also approves of heightened confidentiality in juvenile proceedings. In *Gault*, the

Court explicitly rejected the notion that all of the due process requirements applicable to adult criminal defendants apply equally to juvenile offenders. *Gault*, 387 U.S. at 30 (citing *Kent v. United States*, 383 U.S. 541, 562, 86 S. Ct. 1045, 16 L. Ed. 2d 84 (1966)). It also held that "there is no reason why, consistently with due process, a State cannot continue, if it deems it appropriate, to provide and to improve provision for the confidentiality of records of police contacts and court action relating to juveniles." *Id.* at 25. In *McKeiver*, the Court noted that injecting jury proceedings into juvenile offender adjudications is not constitutionally required because "it would bring with it into that system the traditional delay, the formality, and the clamor of the adversary system and, possibly, the public trial." *McKeiver*, 403 U.S. at 550.

More recent Supreme Court cases have clearly reaffirmed that there are measurable and material differences between juveniles and adults that have constitutional implications. As our own legislature has done, the Supreme Court based its decisions on a combination of empirical data, common sense, and evolving standards of justice. *E.g.*, *Miller v. Alabama*, 567 U.S. ___, 132 S. Ct. 2455, 2464-65, 183 L. Ed.2d 407 (2012) (juveniles cannot be subjected to mandatory life sentences without the possibility of early release); *Graham v. Florida*, 560 U.S. 48, 82, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010) (juveniles cannot be sentenced to life in prison without the possibility of early release for

nonhomicide offenses); *Roper v. Simmons*, 543 U.S. 551, 578, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005) (juveniles can never be subjected to capital punishment). The Supreme Court's case law clearly shows that treating juveniles and adults the same way in all respects is not only unwise but sometimes unconstitutional.

As it was historically, Washington's experience regarding juvenile courts and juvenile court records is clearly consistent with practices in other jurisdictions today. Requiring a separate *Ishikawa* analysis for the statutory sealing of juvenile records is no more supported by national experience than by Washington experience.

> (c)    Former RCW 13.50.050 is consistent with the views of professional organizations and commentators

Finally, in addition to the official decisions of lawmakers, the views of professional organizations and commentators support the legislature's duty to provide for the sealing of juvenile records and the substance of the provisions of former RCW 13.50.050. This is true even from commentators who are skeptical of juvenile justice legislation generally.

The joint commission of the Institute of Judicial Administration and the American Bar Association strongly recommended the need for legislative action: "The legislature of each jurisdiction should promulgate a comprehensive statute regulating the practices and policies of juvenile courts with respect to the collection, retention, dissemination, and use of information and records pertaining

to juveniles." ABA JUVENILE JUSTICE STANDARDS, *supra*, at 100 (std. 11.1). As to the particulars of this comprehensive legislation, the joint commission advised that "[a]ccess to and the use of juvenile records should be strictly controlled," and provided only to specified individuals. *Id.* at 115-16 (stds. 15.1(B), 15.2). Some of the minimum standards recommended actually provide more confidentiality than former RCW 13.50.050, such as the general provision that "[j]uvenile records should not be public records," *id.* at 115 (std. 15.1(A)), and the provision for destroying juvenile court records, rather than merely sealing them and vacating the adjudication, *id.* at 129 (std. 17.3).

Support for Washington's approach can also be found in the views of many commentators. It is unsurprising that commentators who appear to support the juvenile court philosophy and model also support enhanced confidentiality for juvenile records or proceedings. *See, e.g.*, Ashley Nellis, *Addressing the Collateral Consequences of Convictions for Young Offenders*, 35 THE CHAMPION 20, 26 (2011); Danielle R. Oddo, Note, *Removing Confidentiality Protections and the "Get Tough" Rhetoric: What Has Gone Wrong with the Juvenile Justice System?*, 18 B.C. THIRD WORLD L.J. 105, 131-35 (1998). However, even an author claiming "that rehabilitation of serious juvenile delinquents is more fiction than fact" recognizes that for rehabilitated former juvenile offenders, "the stigma of permanently wearing the label of juvenile delinquent" is not appropriate. T.

Marcus Funk, *A Mere Youthful Indiscretion? Reexamining the Policy of Expunging Juvenile Delinquency Records*, 29 U. MICH. J. L. REFORM 885, 891, 905 (1996). The support for Washington's approach from commentators with widely divergent views of the juvenile justice system further supports this state's experience with juvenile court records.

For as long as there have been juvenile courts in Washington, juvenile court records have been treated as different from adult criminal court records and have been subject to legislation providing increased confidentiality for them. This court has always given effect to the legislature's policy judgments in this particular arena, and Washington's approach is supported by the experience of other states and Supreme Court jurisprudence, both historically and currently. It is also supported by the recommendations of professional organizations and even the views of commentators who do not believe in the juvenile court's rehabilitative mission. We therefore conclude that juvenile court records that meet statutory sealing requirements have not historically been open to the press or the general public and that the experience prong is not met.

C.    A presumption of openness for juvenile records that meet statutory sealing requirements would negatively impact the functioning of juvenile courts

We turn now to the logic prong of the logic and experience test, and consider ""'"whether public access plays a significant positive role in the functioning of the particular process in question."'"" *Morgan*, 180 Wn.2d at 325 (quoting *Sublett*, 176

Wn.2d at 73 (quoting *Press-Enter. Co.*, 478 U.S. at 8)). In the particular process of sealing juvenile court records by statute, carefully drawn provisions balance the juvenile's interest in confidentiality and the importance of confidentiality to promote the rehabilitative purpose of juvenile courts with the public's interest in safety and oversight. Public access to juvenile court records that meet the statutory sealing requirements of former RCW 13.50.050 would not contribute to the functioning of juvenile courts.

1.    In the juvenile court context, there is a valid distinction between court proceedings and court records

The State takes an absolutist approach, arguing that if we hold article I, section 10 and *Ishikawa* do not apply where juvenile records are sealed pursuant to statute, we must also hold that article I, section 10 and *Ishikawa* do not apply to any aspect of juvenile court proceedings. We are not presented with the question of whether juvenile court proceedings should be presumptively open under article I, section 10—they already are presumptively open under RCW 13.40.140(6). These open proceedings serve "to ensure a fair trial, to remind the prosecutor and judge of their responsibility to the accused and the importance of their functions, to encourage witnesses to come forward, and to discourage perjury." *Sublett*, 176 Wn.2d at 72. The sealing statute does not remove juvenile proceedings from public observation.

While the analysis for records and proceedings are often similar, *Chen*, 178 Wn.2d at 356, that does not mean they must always lead to the same conclusions. When applying the experience and logic test, we "consider the actual proceeding at issue for what it is, without having to force every situation into predefined factors." *Sublett*, 176 Wn.2d at 73. In the case of juvenile courts, there are plain distinctions between the openness of proceedings, which provide valuable public oversight, and the statutory sealing of records, which promote the rehabilitative purpose of the juvenile justice system. Lest there be any concern about collapsing the distinction between sealing certain juvenile records and closing courtrooms, we remain committed to the statutory presumption that all juvenile court hearings are, and shall remain, open to the public.

> 2.    Relevant statutory provisions are carefully drawn to balance the competing interests presented by the juvenile justice system

An *Ishikawa* analysis balances the need for confidentiality with the public's interest in open courts, *Ishikawa*, 97 Wn.2d at 37-39, and former RCW 13.50.050 does as well.[6] It is not a broad, categorical mandate for closed proceedings like

---

[6]Where an individual seeks to seal a juvenile court record but does not meet the statutory requirements, the *Ishikawa* factors may still guide the court's decision. *In re Dependency of J.B.S.*, 122 Wn.2d 131, 137-38, 856 P.2d 694 (1993); *State v. C.R.H.*, 107 Wn. App. 591, 596-97, 27 P.3d 660 (2001). However, treating former RCW 13.50.050 as a prerequisite that must be satisfied before the juvenile court can consider the *Ishikawa* factors inserts an additional step into the ordinary process for sealing records under GR 15. *See Hundtofte*, 181 Wn.2d at 7-8. This could have the counterintuitive result of making it *more* difficult to seal a record that meets the statutory requirements than one that does not.

28

former MPR 1.3 (1974) was. *In re Det. of D.F.F.*, 172 Wn.2d 37, 38, 41, 256 P.3d 357 (2011); *see also Allied Daily Newspapers of Wash. v. Eikenberry*, 121 Wn.2d 205, 208-12, 848 P.2d 1258 (1993) (striking down Laws of 1992, ch. 188, § 9, which prohibited *any* disclosure of *any* information identifying *any* child sexual assault victim in *any* court proceedings and records relating to the sexual assault prosecution). Rather, it is carefully drawn so as to give effect to the juvenile courts' rehabilitative purpose while maintaining public accountability and safety.

The need for confidentiality in this context is substantial, both for the subject of the juvenile court record and for the juvenile courts' purpose of preventing adult recidivism. A publicly available juvenile court record has very real and objectively observable negative consequences, including denial of "housing, employment, and education opportunities." LAWS OF 2014, ch. 175, § 1(1); *see* Oddo, *supra*, at 108; Leila R. Siddiky, Note, *Keep the Court Room Doors Closed So the Doors of Opportunity Can Remain Open: An Argument for Maintaining Privacy in the Juvenile Justice System*, 55 HOW. L.J. 205, 232 (2011).

In public housing, a single juvenile offense might result in the entire family's eviction. Nellis, *supra*, at 23; Siddiky, *supra*, at 236; *see Dep't of Hous. & Urban Dev. v. Rucker*, 535 U.S. 125, 136, 122 S. Ct. 1230, 152 L. Ed. 2d 258 (2002). In the employment context, an open juvenile court record forecloses many possibilities, particularly where the employer subscribes to the view that

individuals who have previously violated the criminal laws, as a class, "adopt an opportunistic attitude, choosing to act upon their criminal predisposition when the opportunity arises." Funk, *supra*, at 929; *see* Nellis, *supra*, at 23; Siddiky, *supra*, at 236. Finally, an open juvenile record makes it more difficult to obtain even a high school diploma, much less postsecondary education. Nellis, *supra*, at 22; Siddiky, *supra*, at 234-36. Juvenile courts are intended to prevent adult recidivism, but lack of housing, employment, and education all increase the likelihood of recidivism. Funk, *supra*, at 927; Nellis, *supra*, at 20; Oddo, *supra*, at 131.

The stigma of an open juvenile record and the negative consequences that follow are particularly unjustifiable in light of the fact that the mind of a juvenile or adolescent is measurably and materially different from the mind of an adult, and juvenile offenders are usually capable of rehabilitation if given the opportunity. *Miller*, 132 S. Ct. at 2464-65 & n.5; Nellis, *supra*, at 24; Looking to the Future: Adolescent Brain Development and the Juvenile Justice System (Wash. Sup. Ct. Symposium, May 20, 2014), at 5 min., 56 sec. to 2 hr., 56 sec., *recording by* TVW, Washington State's Public Affairs Network, *available at* http://www.tvw.org. The legislature's approach also recognizes that open juvenile records implicate and exacerbate racial disparities. It is well documented that juveniles of color face disproportionately high rates of arrest and referral to juvenile court. *E.g.*, Siddiky, *supra*, at 218-19; Looking to the Future, *supra*, at 2 hr., 36 min., 58 sec. to 2 hr., 56

min., 2 sec. Combined with the indisputable detrimental effects of open juvenile records, the racial imbalances in the juvenile justice system create and perpetuate barriers to economic and social advancement that vary, in the aggregate, on the basis of race.

Weighed against this need for confidentiality are the needs for public safety and oversight, which are amply provided for in former RCW 13.50.050 and related statutes. To protect public safety, juvenile court records are not sealed immediately upon disposition. Former RCW 13.50.050(12)(b)(i). The former juvenile offender must demonstrate rehabilitation and restitution. *Id.* at (12)(b)(i)-(v). The records of serious offenses are presumed open for much longer, and the records regarding some offenses cannot ever be sealed. *Id.* at (12)(a)(i), (v). The victim and the victim's immediate family are entitled to information regarding the identity of the subject of juvenile offender proceedings. *Id.* at (9). Any subsequent adjudication in juvenile court or conviction in adult court automatically nullifies the sealing order. *Id.* at (16). To provide for public accountability, former RCW 13.50.050 requires reasonable notice before a sealing motion will be granted, and as is evident from this case, the State is given an opportunity to argue the statutory sealing requirements are not met. *Id.* at (13). Juvenile proceedings are presumptively open, RCW 13.40.140(6), and even after sealing, the records remain available for legitimate research purposes, RCW 13.50.010(8); *Seattle Times*, 99 Wn.2d at 253.

Public safety and accountability are also protected by provisions allowing some juvenile offender cases to be transferred to the adult criminal courts. Certain serious violent offenses by older juveniles are automatically tried in adult criminal court, and other juvenile cases may be transferred to the adult criminal court when the juvenile court determines that it is in the best interest of either the juvenile or the general public. *Saenz*, 175 Wn.2d at 174 & nn.1-2. Once a case is in the adult criminal system, the protections of the juvenile system, including former RCW 13.50.050, do not apply and any future offenses will automatically be heard in the adult criminal court. *Id.* at 174.

The provisions of former RCW 13.50.050 are detailed, are carefully drawn, and account for the competing interests at stake in the unique context presented.[7] Where all the statutory sealing requirements are met, public access to juvenile court records is detrimental to the rehabilitative purpose of juvenile courts and does not enhance the competing concerns of public safety and accountability. The logic prong is not met.

---

[7]We respectfully disagree with the dissent's suggestion that the balance of relative openness and confidentiality is the same in juvenile court records as it is in other situations. The logic prong compels us to look to the overwhelming weight of data showing that open juvenile court records are detrimental to the JJA's stated purpose of rehabilitating juveniles and giving them an opportunity for a fresh start early in life.

## CONCLUSION

Both experience and logic show that article I, section 10 does not apply and an *Ishikawa* analysis is not needed in order to seal juvenile court records pursuant to statute. We affirm the juvenile court.

_____

WE CONCUR:

Madsen, C. J.
_____

_____

Wiggins, J.
_____

_____

González, J.
_____

Fairhurst, J.
_____

No. 90355-7

STEPHENS, J. (dissenting)—The provisions of former RCW 13.50.050 (2011) at issue in this case are fully consistent with the state constitution and our court rules. Unfortunately, the trial court misapplied former RCW 13.50.050(12) by reading it as a nondiscretionary mandate to seal. The majority similarly misreads the statute to forbid the individualized determination we require to seal court records under article I, section 10 and Washington's General Rule (GR) 15. As a result, the majority engages in an entirely unnecessary explanation of why it would take the unprecedented step of exempting the entire category of juvenile court records from constitutional scrutiny.

I would not be so ambitious. I would recognize that juvenile records are court records fully subject to the presumption of openness. Experience and logic confirm this, as does our precedent. Former RCW 13.50.050 respects the fact that it is the trial judge who must decide whether to enter a sealing order. A proper application of the statute requires the judge to consider first whether the statutory prerequisites are met and then to engage in an individualized assessment of

whether sealing is justified under GR 15 and the constitution. Because the trial court did not believe it could conduct the individualized inquiry, I would reverse and remand for further consideration of S.J.C.'s motion to seal under GR 15 and article I, section 10.

## ANALYSIS

I wholly share the majority's concern that lingering juvenile records can have negative consequences on an individual's reintegration into society. However, I disagree with the majority that exempting juvenile records entirely from the constitutional promise of open justice is the solution. The openness of our courts is a prevailing principle of our constitution. I believe the question before us is whether the juvenile sealing statute, former RCW 13.50.050, complies with article I, section 10 of our constitution.

The majority avoids this question by making it irrelevant. It posits a false choice between applying article I, section 10 to invalidate the statute entirely and simply not applying article I, section 10 at all. I believe our open courts jurisprudence suggests a different path. We should recognize—as has the legislature—that juvenile courts are courts subject to the constitutional presumption of openness. But, this does not mean any sealing statute is dead on arrival. While a statute may not predetermine the existence of compelling circumstances to seal court records, it can establish policy-based considerations relevant to sealing and create a uniform procedure for judges to follow, consistent

with *Seattle Times Co. v. Ishikawa*, 97 Wn.2d 30, 37-39, 640 P.2d 716 (1982). Former RCW 13.50.050(12) does just that.

A. Former RCW 13.50.050(12) Establishes Prerequisites To Bringing a Motion To Seal and Does Not Exempt Juvenile Records from the Constitutional Presumption of Openness

The relevant language of former RCW 13.50.050(12), set out in the majority opinion at pages 2-3, identifies five preconditions to sealing juvenile court records. Notably, it does not say a trial court *shall grant* a motion to seal when these conditions are met, but rather "[t]he court *shall not* grant any motion to seal records . . . *unless* [the conditions are met]." Former RCW 13.50.050(12) (emphasis added). This negative language was the result of a 2001 amendment, which removed the earlier "shall" phrasing that appeared to be mandatory. LAWS OF 2001, ch. 49, § 2; *see State v. Webster*, 69 Wn. App. 376, 378-79, 848 P.2d 1300 (1993) (holding trial court was required to grant motion in light of "shall" mandate).[1] By its plain terms, former RCW 13.50.050(12) cannot be read as an inflexible mandate that forecloses any constitutional analysis.

---

[1] RCW 13.50.260, effective June 12, 2014, differs significantly in structure from former RCW 13.50.050. It states that a court "shall hold regular sealing hearings" and "shall administratively seal an individual's juvenile court record pursuant to the requirements of this subsection unless the court receives an objection to sealing or the court notes a compelling reason not to seal, in which case, the court shall set a contested hearing to be conducted on the record to address sealing." RCW 13.50.260(1)(a). Whether this statute meets constitutional muster is not before us. I mention it only to acknowledge the use of the term "shall" and to note that, in context, it clearly anticipates that the court will make an individualized determination whether to seal and not automatically enter an order when the statutory conditions are met.

That former RCW 13.50.050(12) does not require automatic sealing is confirmed by the placement of this subsection in a statute that begins with the presumption of openness. Former RCW 13.50.050(2) states that "[t]he official juvenile court file of any alleged or proven juvenile offender shall be open to public inspection, unless sealed pursuant to subsection (12) of this section." Relatedly, former RCW 13.50.050(14) recognizes that a court considering a motion brought pursuant to RCW 13.50.050(12) has discretion in deciding whether to grant it because it details procedures that apply only "[i]f the court grants the motion to seal." Former RCW 13.50.050(14)(a).

When considering statutes or court rules regarding sealing, this court likewise begins with a presumption of openness. Our constitution mandates that "[j]ustice in all cases shall be administered openly." WASH. CONST. art. I, § 10. This provision entitles the public to open court proceedings and records. *Ishikawa*, 97 Wn.2d at 36 (quoting *Cohen v. Everett City Council*, 85 Wn.2d 385, 388, 535 P.2d 801 (1975)). The right to open courts and open records is the "'bedrock foundation'" of our judicial system, which allows the public to observe and scrutinize the administration of justice. *In re Det. of D.F.F.*, 172 Wn.2d 37, 40, 256 P.3d 357 (2011) (lead opinion) (quoting *John Doe v. Puget Sound Blood Ctr.*, 117 Wn.2d 772, 780-81, 819 P.2d 370 (1991)). We have repeatedly emphasized the "utmost public importance" of open courts and open records. *Dreiling v. Jain*, 151 Wn.2d 900, 903, 93 P.3d 861 (2004). Like the openness of court proceedings, the right of access to judicial records "'serves to enhance the basic fairness of the

proceedings.'" *Id.* at 909 (quoting *Republic of Philippines v. Westinghouse Elec. Corp.*, 139 F.R.D. 50, 56 (D.N.J. 1991)).

Because the openness of court proceedings and records is at the core of our system of justice, we have consistently measured statutes and court rules providing for sealing against article I, section 10. In *Allied Daily Newspapers of Washington v. Eikenberry*, 121 Wn.2d 205, 207, 848 P.2d 1258 (1993), this court considered a statute that required courts to redact identifying information of child victims of sexual assault made during the course of trial or contained in court records.[2] The underlying purpose of the statute, which was to protect child victims of sexual assault, did not exempt the statute itself from constitutional scrutiny under article I, section 10. *Id.* at 210-11. While the compelling interests identified in the statute may have sufficed on an individualized basis to warrant sealing, the law did not permit such individualized judicial determinations. *Id.* Thus, we held the statute was unconstitutional because it was not in accordance with the *Ishikawa* guidelines. *Id.*[3]

Similarly, in *D.F.F.*, this court applied article I, section 10 protections to invalidate a court rule mandating the closure of civil mental health proceedings. 172 Wn.2d at 38, 41. The fact that this court promulgated the rule did not exempt it from constitutional scrutiny. In *Dreiling*, 151 Wn.2d at 915, and *Rufer v. Abbott*

---

[2] A subsection of former RCW 13.50.050 that is not before us in this case contains a similar provision. *See* former RCW 13.50.050(24).

[3] The majority does not discuss *Eikenberry*; I believe its only answer to that case would be that article I, section 10 does not apply to records of juvenile proceedings. As discussed below, that argument is not supportable.

*Laboratories*, 154 Wn.2d 530, 549, 114 P.3d 1182 (2005), we recognized that the sealing of court records under the civil rules must comply with the *Ishikawa* constitutional analysis. In the particular context of juvenile court records, we further recognized that *Ishikawa* provides an appropriate framework for considering motions to seal under GR 15 and that GR 15 applies to juvenile court records. *In re Dependency of J.B.S.*, 122 Wn.2d 131, 856 P.2d 694 (1993); *see also* GR 15(c)(1) (applying the same sealing procedure to criminal and juvenile cases), 31(c)(4) (defining "court records" to include juvenile records).

The court in *J.B.S.* explained that the *Ishikawa* analysis provides an appellate court the flexibility it needs to make decisions regarding sealing under GR 15 on a case-by-case basis. 122 Wn.2d at 139. The majority states that the court in *J.B.S.* held that "[w]here an individual seeks to seal a juvenile court record but does not meet the statutory requirements, the *Ishikawa* factors" apply. Majority at 28 n.6. This suggests *Ishikawa* is merely a fallback analysis, but that is not the holding in *J.B.S.* *J.B.S.* held that while the juvenile sealing statute at issue did not apply to appellate proceedings, GR 15 did apply; further, the *Ishikawa* analysis provides a framework for applying GR 15. 122 Wn.2d at 139. GR 15 itself contemplates sealing statutes and integrates them into the individualized determination of whether compelling reasons exist to justify the sealing of records. GR 15(c)(2). By its plain terms, the rule is not simply a fallback in the event that there is no statute. *See State v. Chen*, 178 Wn.2d 350, 356, 309 P.3d 410 (2013) (rejecting the proposition that the *Ishikawa* factors apply only when there is not

-6-

statutory guidance for closure). The trial court in this case did not apply GR 15, as required by the rule and by *J.B.S.*

Nothing in the language of former RCW 13.50.050 suggests that it is unique among sealing statutes and should not similarly be measured against the constitutional standard. The majority assumes the statute is unamenable to allowing a judge to make an individualized decision whether to seal records in a particular case, but we should read the statute in a way that avoids a constitutional conflict. By its plain terms, the sealing provision in former RCW 13.50.050(12) can be applied consistent with the *Ishikawa* analysis and GR 15. And, by its plain terms, GR 15 applies to any judicial decision to seal records, including juvenile records. GR 15(c), 31(c)(4). I would resolve the present case on this narrow basis, and remand for the trial court to apply GR 15 using the *Ishikawa* framework.[4]

Because the majority rejects this approach and holds that juvenile court records are not subject to constitutional scrutiny, I now address that analysis and offer a contrary view.

B. Juvenile Court Records Are Court Records Subject to Article I, Section 10's Presumption of Openness

In *State v. Sublett*, this court adopted from the United States Supreme Court the experience and logic test to determine whether the constitutional public trial right attaches to a particular proceeding. 176 Wn.2d 58, 73, 292 P.3d 715 (2012)

---

[4] Because *J.B.S.* recognized that the *Ishikawa* analysis applies under GR 15 regardless of whether it is constitutionally mandated, it is possible to resolve this case on the basis of the trial court's failure to apply GR 15. The court can leave for another day the broader constitutional question.

(lead opinion); *see also Press-Enter. Co. v. Superior Court*, 478 U.S. 1, 8, 106 S. Ct. 2735, 92 L. Ed. 2d 1 (1986)) (adopting the experience and logic test). Applying this test, the majority concludes that we have "built a constitutional wall around juvenile justice," majority at 9, so that article I, section 10's presumption of openness does not apply to juvenile records. I disagree. Our constitution affords greater public trial rights than its federal counterpart. *See State v. Smith*, 181 Wn.2d 508, 525, 334 P.3d 1049 (2014) (Wiggins, J., concurring); *Rufer*, 154 Wn.2d at 549 (recognizing distinction from federal law in light of explicit open courts provision in article I, section 10). As such, any application of the experience and logic test should account for Washington's more stringent open courts doctrine. In light of the history, purpose, and functions of juvenile court proceedings, the open courts provision of article I, section 10 applies to juvenile court records.

1. *Experience Confirms the Presumption of Openness for Juvenile Records*

We look to experience to determine whether the proceeding in question is the type that requires article I, section 10 protections. This is achieved by understanding the nature of the proceeding, the statutes, and our precedent. *See Sublett*, 176 Wn.2d at 73-76 (lead opinion). The records in question in this case are court records created during a judicial proceeding, which by their nature are entitled to article I, section 10 protections. In holding otherwise, the majority erroneously relies on precursor statutes and focuses on the rehabilitative purpose of the juvenile justice system.

We must consider the *nature* of juvenile court proceedings, not whether their underlying purpose is rehabilitative versus criminal. The majority thoroughly discusses the negative consequences and stigma associated with having open juvenile records. Majority at 24-26, 28-32. I do not disagree with the majority on these points. This case, however, must be decided based on whether a juvenile record is subject to constitutional protections. If we place weight on the benefits of sealing juvenile records, as the majority does, I believe the sealing and vacation of adult criminal records or of other civil records is equally compelling. *See State v. Breazeale*, 144 Wn.2d 829, 837-38, 31 P.3d 1155 (2001) (finding that a statute permitting vacation of felony convictions exists to "prohibit all *adverse consequences* of a dismissed conviction" (emphasis added)). Many court records have similar impacts on individuals, including denial of housing and employment opportunities. *See Hundtofte v. Encarnación*, 181 Wn.2d 1, 330 P.3d 168 (2014) (discussing how tenants are denied housing because of records of unlawful detainer actions); ENGROSSED SUBSTITUTE H.B. 1553, 64th Leg., Reg. Sess., at 2 (Wash. 2015) (bill seeking to reduce barriers to employment and housing for adults and juveniles to help them "reintegrate into society"); Michael Pinard & Anthony C. Thompson, *Offender Reentry and the Collateral Consequences of Criminal Convictions: An Introduction*, 30 N.Y.U. REV. L. & SOC. CHANGE 585, 594-98 (2006) (discussing how individuals are barred from successful reentry into communities because of records of prior criminal convictions); EQUAL EMP'T OPPORTUNITY COMM'N, *Consideration of Arrest and Conviction Records in*

*Employment Decisions Under Title VII of the Civil Rights Act of 1964*, EEOC Enforcement Guidance 915.002, at 6 (2012), *available at* http://www.eeoc.gov/ laws/guidance/upload/arrest_conviction.pdf (noting that over 90 percent of employers conduct background checks on some or all job applicants, according to a survey). The constitution requires us to consider the nature of the proceeding, the statutes, and our precedent.

The majority points to statutes that have provided juveniles some level of confidentiality. Majority at 10. However, its reliance on these statutes fails to appreciate the context under which precursor statutes were enacted. Juvenile courts emerged from social reform movements that sought to assist troubled and helpless children under the parens patriae doctrine. Mary Kay Becker, *Washington State's New Juvenile Code: An Introduction*, 14 GONZ. L. REV. 289, 290-91, 307-08 (1979). Under this doctrine, "society's duty to the child could not be confined by the concept of justice alone." *In re Gault*, 387 U.S. 1, 15-16, 87 S. Ct. 1428, 18 L. Ed. 2d 527 (1967). Juveniles were treated for symptomatic concerns, so "sentences were indeterminate, nonproportional, and potentially continued for the duration of minority." Barry C. Feld, *The Transformation of the Juvenile Court*, 75 MINN. L. REV. 691, 695 (1991).

> "The juvenile court movement was 'anti-legal' in the sense that it encouraged minimum procedural formality and maximum dependency on extra-legal resources. The judges were authorized to investigate the character and social background of both 'pre-delinquent' and 'delinquent' children. They examined personal motivation as well as criminal intent, seeking to identify the moral reputation of the problematic children."

Bobby Jean Ellis, *Juvenile Court: The Legal Process as a Rehabilitative Tool*, 51 WASH. L. REV. 697, 699 n.6 (1976) (quoting ANTHONY M. PLATT, THE CHILD SAVERS: THE INVENTION OF DELINQUENCY 141 (1969)). Juvenile proceedings at the time sometimes occurred outside of public view, as statutes provided for the total exclusion of the general public. *See* LAWS OF 1913, ch. 160, § 10. In 1961, the legislature completely shut the public out from delinquency proceedings. LAWS OF 1961, ch. 302, § 5. Juveniles were largely denied fundamental due process rights. *In re Welfare of Lewis*, 51 Wn.2d 193, 199, 316 P.2d 907 (1957).

Court challenges to this model were rejected early on. *See Weber v. Doust*, 84 Wash. 330, 333-34, 337, 146 P. 623 (1915) (finding no due process violation of a juvenile's detention without a warrant, as courts may exercise parens patriae authority over a child); *Lewis*, 51 Wn.2d at 198 (citing with approval a Pennsylvania Supreme Court decision indicating that rights granted to persons accused of a crime are inapplicable to children). This is the context in which juveniles were historically granted some level of confidentiality.

The juvenile justice system of today bears little resemblance to its former self. The juvenile justice system has emerged out of the shadows in light of *Gault* and passage of the Juvenile Justice Act of 1977, ch. 13.40 RCW, shifting doctrinally away from the parens patriae doctrine of "'benevolent coercion, and closer to a more classical emphasis on justice.'" *State v. Rice*, 98 Wn.2d 384, 391, 655 P.2d 1145 (1982) (quoting Becker, *supra* at 307-08). While the juvenile justice system retains its goal of rehabilitation, attitudes about the openness and

formality of the juvenile justice system have changed. *Gault* rejected the principles this court once observed in *Lewis*, which presumed that fundamental due process rights were simply inapplicable in juvenile proceedings. *Lewis*, 51 Wn.2d at 199. In addition, the Juvenile Justice Act of 1977 embraced the principle of openness, presumptively opening to the public juvenile proceedings and official court files. LAWS OF 1977, 1st Ex. Sess., ch. 291, §§ 10(1)(a), 68(6). Thus, juvenile courts no longer have the power to exclude the general public from proceedings, LAWS OF 1913, ch. 160, § 10, and juvenile proceedings are no longer presumptively closed, LAWS OF 1961, ch. 302, § 5.

Considering the full arc of the development of juvenile justice in this state, and in particular the culture shift since *Gault*, the majority's reliance on experience to erode the presumption of openness is misplaced. The statutory and legislative history relating to juvenile offenders and the confidentiality granted to them has not demonstrated a consistent theme of confidentiality. The juvenile justice system has encountered a series of transformations since its initial creation, but its recent and current form acknowledges that juvenile proceedings benefit from transparency and openness.

In addition to statutes, this court's precedent undermines the majority's conclusion that juvenile records are exempt from constitutional scrutiny. Majority at 16. Citing *Lewis*, the majority reasons the presumption of openness does not apply to juvenile proceedings because the juvenile justice system seeks to rehabilitate, rather than deter or punish. *Id.* However, *Lewis* no longer controls or

is relevant to our analysis. *Lewis* held that juvenile proceedings did not involve justice under article I, section 10 because punishment was not being administered, i.e., the proceeding was not criminal. 51 Wn.2d at 198.

It is now clear that the promise of open justice under article I, section 10 is not limited to criminal cases. Our open courts doctrine no longer turns on whether a proceeding is punitive or rehabilitative. *See D.F.F.*, 172 Wn.2d at 42. In *D.F.F.*, this court applied article I, section 10 protections to invalidate a court rule closing civil mental health proceedings. *Id.* at 38, 41. And, we have consistently held that court records in civil cases are subject to article I, section 10. *See Dreiling*, 151 Wn.2d at 915 (finding that documents filed in support of dispositive motions in a civil case are subject to *Ishikawa*); *Rufer*, 154 Wn.2d at 549 (finding that documents filed with the court in a civil case, whether dispositive or not, are subject to the compelling interest standard described in *Ishikawa*).

Thus, to the extent *Lewis* stands for the proposition that article I, section 10 applies only to criminal cases, that holding has been expressly abrogated by this court. Further, *Lewis* was premised on an outmoded notion of parens patriae, which was later rejected in *Gault*. *See Gault*, 387 U.S. at 16. *Lewis*'s holding that "juvenile courts are not criminal courts, and constitutional rights granted to persons accused of [a] crime are not applicable to children brought before such a court" is simply wrong as the law stands today. 51 Wn.2d at 198.

The majority erroneously asserts that we always give effect to sealing statutes without subjecting them to a constitutional analysis. This is not so. As

noted, this court has entertained constitutional challenges to similar statutes. *See supra* pp. 5-6 (discussing *Eikenberry*, 121 Wn.2d 205). Quite recently in *State v. Sanchez*, a juvenile offender challenged the release of his SSODA (special sex offender disposition alternative) file to local law enforcement under RCW 4.24.550(6), arguing, inter alia, that its release would violate his constitutional right to privacy. 177 Wn.2d 835, 846, 306 P.3d 935 (2013). The statute governs the release of information about sex offenders to the public. While we ultimately held that the offender's constitutional privacy rights were not violated, we recognized that the defendant could challenge the statute on constitutional grounds. *Id.* In *State v. Chen*, 178 Wn.2d 350, 352, 309 P.3d 410 (2013), a defendant argued that statutory provisions provided that competency reports remain private. However, this court held that "once a competency evaluation becomes a court record, it also becomes subject to the constitutional presumption of openness, which can be rebutted only when the court makes an individualized finding that the *Ishikawa* factors weigh in favor of sealing." *Id.* This court rejected the proposition that the *Ishikawa* factors should apply only where there is no statutory guidance for closure. *Id.* at 356.

As the majority notes, we borrowed our own article I, section 10 provision from Oregon's and Indiana's constitutions, and both states have statutory mechanisms for sealing juvenile records. Majority at 21-22. The majority, however, incorrectly suggests that because both states have statutory mechanisms for sealing juvenile records, the statutes are exempt from constitutional scrutiny.

-14-

The statutes in Oregon and Indiana, however, have not been exempted from constitutional scrutiny. To the contrary, the Indiana Supreme Court has recognized that the openness of juvenile records and court proceedings is subject to a balancing of a juvenile's privacy interest and the public's right to access records. In *Taylor v. State*, 438 N.E.2d 275, 278 (Ind. 1982), the court said

> access to a juvenile's records . . . is a 'sensitive' [issue] . . . [that i]nvolve[s]
> . . . a collision of significant public interests—the need to protect juveniles
> from the dissemination . . . versus the extraordinary protections afforded by
> the constitutional guarantees of free speech and press.

(Citations omitted.) Similarly, in *State ex rel. Shelbyville Newspapers, Inc. v. Shelby Superior Court*, 272 Ind. 42, 46, 396 N.E.2d 337 (1979), the court engaged in a balancing test to determine whether the Indiana juvenile record sealing statute placed an impermissible prior restraint on the guarantee of freedom of the press under the First Amendment to the United States Constitution. *Id.* at 46. Indiana does not observe the rule the majority proposes, and Oregon has not recognized such a rule. The Oregon Supreme Court instead held that its own article I, section 10 "does not recognize distinctions between various kinds of judicial proceedings; it applies to all." *State ex rel. Oregonian Publ'g Co. v. Deiz*, 289 Or. 277, 283, 613 P.2d 23 (1980).

In sum, the nature of juvenile proceedings, relevant statutes, and our precedent all support the conclusion that juvenile proceedings, and the records created by them, are judicial proceedings subject to the presumption of openness.

For these reasons, experience dictates that juvenile records fall within the protective scope of article I, section 10.

### 2. *Logic Favors the Presumption of Openness for Juvenile Records*

In deciding the logic prong, we consider "'whether public access plays a significant positive role in the functioning of the particular process in question.'" *Sublett*, 176 Wn.2d at 73 (lead opinion) (quoting *Press-Enter. Co.*, 478 U.S. at 8). The logic prong "allows the determining court to consider the actual proceeding at issue for what it is, without having to force every situation into predefined factors." *Id.*

This court unequivocally recognized that juvenile court records are presumptively open to the public in *State v. A.G.S.*, 182 Wn.2d 273, 340 P.3d 830 (2014). The issue before us in *A.G.S.* was whether a juvenile's SSODA evaluation is part of the juvenile court file, making it "available to the public." *Id.* at 276. We held that records related to a juvenile offender must be kept confidential, unless they are part of the juvenile court record, which is "'open to public inspection.'" *Id.* (quoting former RCW 13.50.050(2)). The majority's proposed rule renders that statutory distinction somewhat meaningless if the entire case file may be closed by statute.

While the majority acknowledges that juvenile proceedings and juvenile court files are presumptively open by statute, it does not wish to acknowledge that this is because they are by their nature court proceedings, which create records open to the public. *See* majority at 14. Uniquely, juvenile matters include both

-16-

materials in the official court file and a confidential social file. *A.G.S.* recognized this difference. Here, we are plainly concerned with the official juvenile court file. So, whatever the experience and logic applicable to the social file may be, the very creation of an official court file logically compels the conclusion that it is presumptively open to the public.

The majority reasons that maintaining confidentiality of juvenile records best serves the underlying purpose of juvenile courts. This conclusion needs to be questioned for two reasons. First, we need to question the premise that confidentiality is beneficial. The State highlights several national and local examples where sealed records prevented or delayed discovery of disturbing incidents. In one case, two judges in Pennsylvania received kickbacks for routinely imposing harsh adjudications on juveniles, in order to increase the number of residents at private juvenile facilities. *See* INTERBRANCH COMM'N ON JUVENILE JUSTICE REPORT 9 (2010), *available at* http://www.pacourts.us/assets/ files/setting-2032/file-730.pdf?cb=4beb87. Locally, a so-called "expert" psychologist repeatedly fabricated testimony in a variety of cases, damaging the resolution of several matters. Ken Armstrong & Maureen O'Hagan, *Seattle Times Special Report: Twisted Ethics of an Expert Witness*, THE SEATTLE TIMES June 26, 2011, 12:02 AM), *available at* http://www.seattletimes.com/seattle-news/seattle-times-special-report-twisted-ethics-of-an-expert-witness. The fabrications were discovered only after *The Seattle Times* moved to unseal court records and disciplinary records, which the expert sought to keep secret. *Id.*

Second, the underlying purpose of sealing juvenile records does not distinguish them from other types of records we have found to be subject to article I, section 10. As noted, in *Eikenberry*, this court found unconstitutional a statute whose underlying purpose was to protect child victims of sexual assault. 121 Wn.2d at 207. The underlying purpose of sealing juvenile records is analogous to the sealing of vacated criminal records, which exists to "prohibit all adverse consequences of a dismissed conviction." *Breazeale*, 144 Wn.2d at 837-38. Yet, courts require an individualized determination under GR 15 and *Ishikawa* to seal criminal records vacated by statute. *State v. Waldon*, 148 Wn. App. 952, 955, 202 P.3d 325 (2009); *see also State v. Noel*, 101 Wn. App. 623, 628-29, 5 P.3d 747 (2000).

We have time and again rejected the majority's presumption that secrecy is beneficial. We instead presume that openness is beneficial and require a case-by-case showing that compelling interests overcome this presumption. *Eikenberry*, 848 Wn.2d at 211. We value openness because it guarantees that the interests of both the public and the accused are protected. *D.F.F.*, 172 Wn.2d at 40-41. "The open administration of justice assures the structural fairness of the proceedings, affirms their legitimacy, and promotes confidence in the judiciary." *Id.* at 40. The majority applies the faulty reasoning from *Lewis* in concluding that because juvenile proceedings are not criminal, they are therefore not open. Majority at 16. As noted, this reasoning has been eclipsed by modern authority extending constitutional protections to noncriminal proceedings. Article I, section 10

-18-

recognizes that openness is essential to how justice is administered, whether the case be criminal or civil.

In sum, there is no logical reason to declare that juvenile court records are not actually court records subject to the presumption of openness. The nature of the juvenile justice system supports the conclusion that such records should be presumptively public, just as court records created in other judicial proceedings. Applying the experience and logic analysis, I would hold that article I, section 10 applies to the sealing of juvenile court records under former RCW 13.50.050.

C. There Is No Basis To Distinguish between Proceedings and Records in Applying Article I, Section 10

The majority purports to limit its holding to juvenile court *records*, even though its analysis—in particular its reliance on *Lewis*—provides no basis for this limitation. Our open courts doctrine has not applied lesser openness standards to records than to proceedings, even when both are subject to closure. To the contrary, we have consistently interpreted proceedings and records similarly, requiring a compelling interest that overcomes the presumption of openness. In *Ishikawa*, we held that the trial court failed to comply with article I, section 10 when it closed a pretrial hearing and sealed records. 97 Wn.2d at 32. We expressly held that "[e]ach time restrictions on access to criminal hearings *or the records from hearings* are sought," a balancing of interests under article I, section 10 is required. *Id.* at 37 (emphasis added). This same standard was applied equally to proceedings and records in *Eikenberry*, 121 Wn.2d at 214.

In *Cohen*, 85 Wn.2d at 389, this court found that a trial court erred in sealing court records by failing to demonstrate "sufficient public importance to justify exception to the requirement of Const. art. 1, § 10." In *Cohen*, the trial court reviewed on appeal the written transcript of license revocation proceedings. Concerned with the nature of the allegations against the licensee, the trial court sealed the transcript. *Id.* at 388. However, we found that the transcript was "public property," which, absent compelling reasons under article I, section 10, "cannot be taken in or kept secret." *Id.* at 389.

In *Dreiling* and in *Rufer*, this court held that *Ishikawa* must be applied to documents filed in support of motions in civil proceedings. *Dreiling*, 151 Wn.2d at 915; *Rufer*, 154 Wn.2d at 549. In *Dreiling*, we said that people have a right to access open courts to "'freely observe the administration of *civil* and criminal justice.'" 151 Wn.2d at 915 (quoting *Eikenberry*, 121 Wn.2d at 211).

In *Chen*, this court found that competency evaluations are presumptively open under article I, section 10. 178 Wn.2d at 350. In *Chen*, a defendant sought to seal his competency evaluation, which a statute deemed confidential. We found that the trial court properly considered the *Ishikawa* factors when redacting certain information from the court record. *Id.* at 358-59. We further noted that "[b]oth [*Eikenberry*] *and* D.F.F. recognize that court records and courtrooms are presumptively open and can be closed only when a trial court makes an individualized finding that closure is justified." *Id.* at 356.

Court rules also require the application of article I, section 10 to proceedings and records. Sealing of court files and records, including juvenile court records, is governed by GR 15(c), which requires an individualized showing of a "**compelling** privacy or safety concern[] that outweigh[s] the public interest in access to the court record." GR 15(c)(2). Further, while "[a]ccess to court records is not absolute," the public's "access to court records [is] provided by article I, section 10." GR 31(a).

Without support, the majority seeks to apply lesser openness standards for records than for proceedings. Majority at 27-28. In so doing, it draws the very distinction we expressly rejected in *Chen*, 178 Wn.2d at 356. The majority says that "there are plain distinctions between the openness of proceedings, which provide valuable public oversight, and the statutory sealing of records, which promote the rehabilitative purpose of the juvenile justice system." Majority at 28. In contrast, in *Chen* we said that although the defendant "attempts to distinguish this case because it involved a courtroom proceeding and not a court record, . . . our jurisprudence has treated court records and court proceedings similarly." 178 Wn.2d at 356.

The majority's reliance on *Sublett* to treat records and proceedings differently is misplaced. In *Sublett* we said that we "consider the actual proceeding at issue for what it is, without having to force every situation into predefined factors." 176 Wn.2d at 73 (lead opinion). The majority reasons that this proposition permits the application of a lesser openness standard for records.

-21-

However, we made the statement in *Sublett* to reject a bright-line distinction made by the Court of Appeals to determine when public trial rights attach and when they do not. We explained, "We decline to draw the line with legal and ministerial issues on one side, and the resolution of disputed facts and other adversarial proceedings on the other." *Id.* at 72. We cannot, consistent with this reasoning, now draw a line with juvenile proceedings on one side and juvenile records on the other. Such an approach risks unraveling an entire body of law under our open courts jurisprudence. Instead, we must carefully consider the nature of the proceeding in question and whether it is entitled to article I, section 10 protections.

The majority's attempt to exempt only juvenile records from article I, section 10 is not supported by our open courts doctrine. This court's precedent makes clear that article I, section 10 presumes that proceedings *and records* will be open, even when the records in question involve sensitive matters.

## D. Courts Cannot Delegate to the Legislature Their Obligation To Safeguard Open Courts under Article I, Section 10

Today's holding risks putting courts on the sideline of constitutional interpretation. Deferring to legislative policymaking on a constitutional question, the majority categorically exempts juvenile sealing statutes from constitutional scrutiny. Majority at 15. This will foreclose the possibility of a constitutional challenge to a statute that goes far beyond former RCW 13.50.050(12). Under the majority's holding, a legislative change that allows juvenile court records to

-22-

become immediately confidential upon adjudication would not be subject to an article I, section 10 challenge.[5]

The majority suggests that requiring compliance with article I, section 10 means a judge cannot rely on a narrowly crafted sealing statute. As discussed above, this is not the case. GR 15 and our precedent recognize that court rules and statutes can provide procedures that guarantee core constitutional rights. *See Rufer*, 154 Wn.2d at 549; *J.B.S.*, 122 Wn.2d at 139. We may find that openness of juvenile court records is an issue of constitutional importance but also find that it is possible to have a narrowly tailored statute that is carefully drawn and complies with *Ishikawa*.

This court's precedent evidences our commitment to our judicial obligation to safeguard openness under article I, section 10. In *Eikenberry* the statute in question served a compelling interest in protecting child victims from further trauma and ensuring their constitutional right to privacy. Recognizing these goals, we nonetheless held that the statute was unconstitutional because it cut out the judiciary's ability to protect individual rights through individualized sealing orders. The blanket rule in *D.F.F.* similarly failed because it prevented an individual's ability to assert his or her constitutional right to open courts in a particular case.

---

[5] Such legislation is not unforeseeable. During the 2014 legislative session, the Legislature enacted Engrossed Second Substitute H.B. 1651, 63d Leg., Reg. Sess. (Wash. 2014), relating to an individual's ability to seal juvenile court records. *See* LAWS OF 2014, ch. 175. Although absent from the final enacted legislation, the bill, as introduced and passed by the House, originally indicated an intent to "*presumptively close*[]" records of juvenile court proceedings and made "[t]he official juvenile court file of any alleged or proven juvenile offender . . . *confidential*." SECOND SUBSTITUTE H.B. 1651, at 2, 63d Leg., Reg. Sess. (Wash. 2014) (emphasis added).

The majority's holding would similarly prohibit courts from balancing individual constitutional rights when sealing juvenile records under former RCW 13.50.050. Such a holding is not demanded by the statute and not allowed by the constitution.

## CONCLUSION

I would recognize that juvenile courts are courts subject to the constitutional presumption of openness. Both experience and logic support the presumption of openness to juvenile court proceedings and records under article I, section 10. An *Ishikawa* analysis is therefore required prior to sealing juvenile court records. I would hold that former RCW 13.50.050(12) can be applied consistent with GR 15 and our constitutional mandate, and reverse and remand for the trial court to make an individualized determination in S.J.C.'s case. Accordingly, I respectfully dissent.

Stephens, J.

George McCloud, J.