[No. 47974-7. En Banc. April 7, 1983.]

THE SEATTLE TIMES COMPANY, *Appellant,* v. THE COUNTY OF BENTON, ET AL, *Respondents.*

252

*Davis, Wright, Todd, Riese & Jones,* by *Michael J. Killeen,* for appellant.

*Curtis Ludwig, Prosecuting Attorney,* and *Ray R. Whitlow, Deputy,* for respondent Benton County.

*Kenneth O. Eikenberry, Attorney General,* and *Larry Watters, Assistant,* for respondent State.

BRACHTENBACH, J.—Dale Douglas Mills, a feature writer for The Seattle Times, was denied access to confidential juvenile files on the grounds that newspaper articles are not "legitimate research" under RCW 13.50.010(8), which permits access for legitimate research for educational, scientific, or public purposes. We find that newspaper journalism *may* be legitimate research, and therefore reverse and remand this case.

The facts are undisputed. Dale Douglas Mills has a degree in journalism from the University of Washington, and she has worked for The Seattle Times as a feature writer, on and off, for 11 years. She specializes in the subject of children. *E.g.,* Mills, *Child Sex–Abuse Victims,* The Seattle Times, May 17, 1981 (Pacific Magazine), at 16. Her articles on juvenile justice and related problems have been

used for instruction in schools throughout Washington and have been reprinted in special publications for parents. Mills also was appointed by King County Superior Court judges to serve 6 years on the Board of Managers of the King County Juvenile Court.

In 1980, Mills began to research the operation of the Juvenile Justice Act of 1977 (hereinafter J.J.A. or the Act) in dependency cases. Specifically, she focused on whether the Act's policy of limited state intervention and respect for parental rights in dependency cases resulted in increased or decreased protection for abused children. As part of her research, Mills selected several cases where nonintervention had apparently worked to the detriment of children previously involved in dependency hearings. In conjunction with this research, Mills sought and received permission from a Snohomish County judge to inspect juvenile court files and listen to tapes of court hearings, and permission from a King County judge to inspect Department of Social and Health Services (DSHS) files and to attend dependency review hearings.

Mills also sought three files concerning two children in Benton County whose situation appeared to fit the subject she was researching. After Mills was denied access to the juveniles' records by the Benton County prosecutor, The Seattle Times filed a motion for permission to inspect the records under RCW 13.50.010(8).

A Benton County Superior Court judge held a closed hearing and heard oral argument from counsel for The Seattle Times, counsel for Benton County, and counsel for DSHS. No oral testimony was taken, nor were the records in question examined by the court. The court denied the motion on the grounds that Mills was not engaged in "legitimate research" under RCW 13.50.010(8). The court also concluded that anonymity of the family could not be preserved if access were permitted. See RCW 13.50.010(8); RCW 13.50.100.

We accepted direct review.

## I

The first issue to be resolved is the definition of legitimate research. RCW 13.50 addresses the maintenance and the release of records of juvenile justice or care agencies. It states, in pertinent part:

> The court may permit inspection of records by, or release of information to . . . *individuals or agencies engaged in legitimate research for educational, scientific, or public purposes.* The court may also permit inspection of, or release of information from, records which have been sealed . . .

(Italics ours.) RCW 13.50.010(8). The purpose of RCW 13.50.010(8), evident from its plain language, is to provide a mechanism to allow specified entities and researchers to have access to juvenile records. Former RCW 13.04.274(4) had a similar provision, but it addressed only records which had been sealed. The current law was intended to clarify and make consistent the provisions governing the release of juvenile records, and RCW 13.50.010(8) ensures that legitimate inquiries into the juvenile justice system will not be hampered by the law's provisions on confidentiality of records.[1]

The value of research cannot be doubted. Access to

---

[1] The legislative purpose of this provision has been ascertained, in part, from letters and memoranda from members of the state judicial council and the Senate Judiciary Committee. *E.g.,* Senate Comm. on the Judiciary, 46th Legislature, *Overview of SSB 2768* (1979); Washington Judicial Council memorandum to Senate Judiciary Committee regarding SB 2924 (Feb. 13, 1979). Such documents are not authoritative, but if drafted prior to, or contemporaneously with, the passage of an act, they may have value in the search for "legislative intent." *State v. Coma,* 69 Wn.2d 177, 417 P.2d 853 (1966); *State v. Leek,* 26 Wn. App. 651, 657, 614 P.2d 209 (1980).

We take judicial notice of these documents for lack of a more substantial record of the legislative history of this provision. The Legislature is required by law to retain for 7 years all "correspondence, amendments, reports, and minutes of meetings made by or submitted to legislative committees or subcommittees . . . in connection with the exercise of legislative or investigatory functions". RCW 40.14.100; RCW 40.14.060. Nevertheless, no such records were found in the legislative files pertaining to RCW 13.50.010(8). The lack of such records is a disservice to the agencies that are empowered to implement the laws and to the courts that must interpret them. It is also a violation of statutory law. RCW 40.14.060.

information for research purposes is necessary to understand the impact of the present system, and to improve upon it. *See* Nejelski & LaPook, *Monitoring the Juvenile Justice System: How Can You Tell Where You're Going, If You Don't Know Where You Are?*, 12 Am. Crim. L. Rev. 9 (1974); Nat'l Advisory Comm'n on Criminal Justice Standards and Goals, *Criminal Justice System* 118 (1973). Information on the effectiveness of a system cannot be ascertained from practice alone, but instead must come from "feedback of the *consequences* of practice, that is, from knowledge of the results of . . . actions." Gottfredson, *Research—Who Needs It?*, 17 Crime & Delinq. 11, 14 (1971). Research provides knowledge of the results of policies, and thus provides the foundation for informed change.

 The question is, therefore, can preparation for a newspaper feature article constitute research? The term research is not defined in the statute, nor in Washington case law. Our statute is, however, an abbreviated version of the rule set forth in the *ABA Standards Relating to Juvenile Records and Information Systems* (Tent. Draft, 1977) prepared by a joint commission of the Institute of Judicial Administration and the American Bar Association. Like RCW 13.50.010(8), standard 5.6 permits access for "research or evaluation" for projects for "valid educational, scientific, or other public purposes". Std. 5.6(A) and (B)(2). In explaining its scope, the commentary to this standard expressly states, "[t]his standard is intended to permit the news media to have access to juvenile records if they otherwise qualify as researchers." Std. 5.6, Commentary at 87. The standards also cite to a series of articles on crime published in The Philadelphia Inquirer newspaper as an example of high quality research. Std. 15.2, Commentary at 117.

Respondents argue that RCW 13.50.010 excludes news media access by the requirement, not found in the standards, that the research be "legitimate." We find, however, that this term is not so limiting.

Since there are no cases construing the term "legitimate research", we turn to the dictionary to ascertain its com-

mon meaning. *Marino Property Co. v. Port of Seattle*, 88 Wn.2d 822, 833, 567 P.2d 1125 (1977). "Legitimate" is defined as "conforming to recognized principles or accepted rules and standards." *Webster's Third New International Dictionary* 1291 (1968), *accord, American Heritage Dictionary* (1970). "Research" is defined as a

> studious inquiry or examination; [especially]: critical and exhaustive investigation or experimentation having for its aim the discovery of new facts and their correct interpretation, the revision of accepted conclusions, theories, or laws in the light of newly discovered facts, or the practical applications of such new or revised conclusions, theories, or laws . . .

*Webster's Third New International Dictionary* 1930 (1968). Thus, "legitimate research" would be a studious inquiry or examination within the purview of recognized principles or accepted rules and standards. The common meaning of this term, plus the guidance offered by the commentaries in the standards, lead us to conclude that studies done by news media personnel *may* qualify as legitimate research under RCW 13.50.010(8).

Given this conclusion, we find that the court erred in its treatment of this case. In its oral opinion the trial judge stated:

> I am not convinced from the record before me that . . .
>
> . . .
>
> . . . Mrs. Mills is a legitimate researcher of the kind that is referred to in the statute. If this were someone . . . doing a . . . Master's thesis or a Doctorate, I think that is what is contemplated, or someone who is doing research for . . . a committee of the legislature, *but doing this research for the purpose of publishing a news article[,] even though a feature article, basically it is a news article, and I think there is some indication that that is not legitimate research* . . . I am unable to recognize that Ms. Mills and the Seattle Times are engaged in legitimate research as contemplated by the statutory scheme . . .

(Italics ours.) Report of Proceedings, at 22. This comment reveals that the judge perceived journalism for a newspaper

as excluded from the scope of the statute. We hold today, however, that newspaper journalism may be included, provided it otherwise qualifies as research. *See* Std. 5.6, Commentary at 87.

■ Nevertheless, the burden of qualifying a project as legitimate research rests with the researcher. *See* Std. 5.6; Senate Comm. on the Judiciary, 46th Legislature, *Overview of Engrossed Substitute Senate Bill 2768,* at 2–3 (1979). Here, Mills asserted that there has been virtually no research on the issue of whether abused children suffer more from intervention or nonintervention by the State. *Cf.* Wald, *State Intervention on Behalf of "Neglected" Children: A Search for Realistic Standards,* 27 Stan. L. Rev. 985, 1038 n.278 (1975) (article favoring establishment of a nonintervention policy). Her articles would, therefore, serve to inform the public, including public officials, of the effects of the J.J.A. policy of nonintervention in child abuse cases. Thus, The Seattle Times argued, Mills is involved in legitimate research for educational and public purposes. *See* RCW 13.50.010(8).

While such generalized statements of research intent have weight, they are not alone sufficient to prove the project meets the standard of legitimate research. We believe the application should include a "detailed description of the proposed project including a specific statement of the information required and the purpose for which the project requires the information". *See* Std. 5.6(B)(3). Furthermore, this statement should include a section on methodology, to assure the court that requests for information are not sought in an arbitrary manner. If the project is not conducted in accordance with the research application, the court may terminate access and impose other restrictions. *Cf.* Std. 5.6 (juvenile agency similarly empowered to terminate project).

## II

Another issue raised is the anonymity requirement in the statute. RCW 13.50.010(8) provides in part:

Access to records or information for research purposes shall be permitted only if the anonymity of all persons mentioned in the records or information will be preserved. Each person granted permission to inspect juvenile justice or care agency records for research purposes shall present a notarized statement to the court stating that the names of juveniles and parents will remain confidential.

Similarly, RCW 13.50.100(8) states that information in juvenile records not related to juvenile offenses "may be released to the public only when that information could not reasonably be expected to identify the juvenile or the juvenile's family."

Mills provided a notarized statement conforming to the statutory requirement in RCW 13.50.010(8). In presenting its motion, The Seattle Times also offered to preserve the anonymity of those mentioned in the files by changing their names, gender, and locale and by complying with any other safeguards required by the court. The trial court found, however, that the particular facts of this case would cause it to be readily recognizable even if the names and location were changed. The bases for this conclusion were: (1) a pending criminal matter relating to alleged child abuse of one of the juveniles; (2) the juveniles' situation had been publicized previously in a sensationalistic manner in a local newspaper; (3) the prior publicity had allegedly had harmful effects on some of the juveniles in the family; and (4) the case was not of a routine nature. The court did not, however, review the records.

■ We find the court's reliance on these factors was misplaced. To begin, a pending criminal matter may justify the imposition of additional safeguards to prevent the misuse of the confidential files, and it may warrant postponing access in certain instances until the criminal matter is resolved. It is not, however, a proper ground for a blanket denial of access under the guise of the anonymity requirement. This is particularly true in light of the fact that most criminal proceedings are public and open to the media. *See* Const. art. 1, § 10; *Seattle Times Co. v. Ishikawa*, 97 Wn.2d

30, 640 P.2d 716 (1982).

In addition, sensationalistic news reports by another newspaper should not serve to preclude access for legitimate research purposes. Because the researcher must maintain the anonymity of the juvenile and the family, it must be presumed that publication of the research will have little or no impact on the research subjects. *See* Std. 5.6(E). Any harmful effects of prior publicity should be considered by the court, but in the context of the anonymity safeguards to be employed. Consequently, the trial court's extrapolation from the harmful effects of a newspaper article which disclosed identities, to the instant request which guarantees anonymity, was inappropriate.

Nor should the nonroutine nature of the case provide grounds for a per se denial of access. As research may provide the foundation for improvements in the system, it is imperative that the researcher have reasonable latitude to collect all relevant information. *See* Std. 5.6, Commentary at 86. To exclude unpleasant realities of the researched subject would serve only to distort the researcher's perspective and promote invalid conclusions. In short, none of these factors have a direct, conclusive bearing on the legitimacy of the research or the researcher's ability to preserve the anonymity of those mentioned in the files. Therefore, reliance on them to deny access was misplaced.

The trial court's failure to examine the records was also an error. To know what is required to preserve anonymity, the trial court must know what is contained in the records. Here, The Seattle Times offered to disguise identities by changing the names, gender, and location of those mentioned in the file. Nevertheless, without looking at the contents of the records, the trial court summarily determined that anonymity was not possible. As the court has broad latitude in imposing anonymity safeguards, such a summary dismissal of the issue was improper. The trial court may have been familiar with the facts in the file, but the record should reflect facts which the court considers of importance.

■ Nothing stated herein is intended to dilute the anonymity requirement contained in RCW 13.50.010(8). The statute states unequivocally that access "shall be permitted only if the anonymity of all persons . . . or information will be preserved." RCW 13.50.010(8). It is the burden of the applicant to submit a detailed plan regarding anonymity. Meeting the statutory requirement of a notarized statement of confidentiality is not sufficient. The trial court is entitled to know the methods by which the researcher proposes to comply with the statute. To preserve anonymity, standard 5.6 requires, *inter alia,* that: (1) a project be designed to preserve the anonymity of the juveniles, (2) the applicant agrees not to reproduce any information from a juvenile record, except for internal purpose, (3) the applicant and all members of the applicant's staff provide a signed, sworn statement not to disclose any information to an unauthorized person, and (4) any final reports of the research not identify the juveniles either directly or indirectly. The court may, in its discretion, impose such anonymity safeguards or others, in the context of RCW 13.50.010(8). It may not, however, deny access for legitimate research purposes if anonymity can be preserved.

### III

■ RCW 13.50.010(8) states the court "may" permit inspection of juvenile records. This indicates a legislative intent to make the trial court's decision discretionary and limit review to the abuse of discretion standard. Abuse of discretion is shown only if the discretion has been exercised upon a ground, or to an extent, "clearly untenable or manifestly unreasonable." *Friedlander v. Friedlander,* 80 Wn.2d 293, 298, 494 P.2d 208 (1972); *State v. Alford,* 25 Wn. App. 661, 665, 611 P.2d 1268 (1980).

Here, the trial court abused its discretion by basing its conclusions on untenable grounds. First, it determined that research for a newspaper did not constitute legitimate research. No findings of fact supported this conclusion. Moreover, it was a misinterpretation of the statute to con-

clude that news media personnel could not qualify as legitimate researchers.

In addition, the court improperly suggested that the unusual nature of the case, the existence and effects of prior sensationalistic newspaper articles, or a pending criminal matter could serve as grounds to deny access. Reliance on these factors, without placing them in the context of the anonymity safeguards imposed on researchers, was inappropriate. Finally, the court's failure to examine the records rendered its decision manifestly unreasonable.

In sum, because the trial court misinterpreted the meaning of the statutory term "legitimate research", failed to review the records at issue, and relied on inappropriate grounds to deny access, we find the trial court's decision was an abuse of discretion.

## IV

As this case will be remanded, we take this opportunity to comment on the appropriate procedures to be followed. First, we believe the issue should be determined in juvenile court. Such a forum would provide judges familiar with juvenile records and would facilitate consistent determinations through comparison with other cases. Also, a hearing should be held, rather than a motion argument, to better apprise the judge of the factors to be weighed by the court.

Another procedural issue is whether notice to the subject of the juvenile record is required. We conclude that it is not required, but may be permitted in special circumstances at the discretion of the trial court.

In the *ABA Standards Relating to Juvenile Records and Information Systems* (Tent. Draft, 1977), researchers are exempted from the usual notice requirement for access to the records by persons unrelated to the subject of the records. Std. 5.4, Commentary at 82. This exemption is undoubtedly premised on the anonymity requirement imposed on researchers.[2] In light of the anonymity safe-

---

[2]Provided that a researcher's access to juvenile records is properly structured

guards, notice to the subject of the records accessed for research purposes appears unnecessary, and could greatly complicate and confuse the issue.

This conclusion is bolstered by analogy to cases and legislative enactments concerning access to records of the mentally ill. In 1971, this court held that access to mental health records was not permitted under the statutes then in existence, and that permission to obtain access required a hearing with notice to one who would take a position adversary to disclosure. *State ex rel. Carroll v. Junker,* 79 Wn.2d 12, 23–25, 482 P.2d 775 (1971). This judicial rule was superseded, however, by the passage of RCW 71.05.390 in 1973. That statute expressly permits disclosure of confidential mental health records for research purposes, if requirements such as confidentiality are met. It is conspicuously silent, however, on any requirement of notice. So too, is RCW 13.50.010(8) silent on the issue of notice, even though notice is expressly required in other sections of the Act. *See, e.g.,* RCW 13.50.010(7). Instead, both RCW 71.05.390 and RCW 13.50.010(8) require only a researcher's "oath" promising that anonymity will be preserved.

RCW 71.05.390 effectively preempted the judicially created notice requirements of *Carroll.* We conclude a similar legislative intent is reflected in RCW 13.50.010(8) and therefore refrain from imposing a notice requirement not found in the statute. *See State ex rel. Carroll v. Junker, supra* at 36 (Williams, J., dissenting).

Reversed and remanded for a determination in light of this opinion.

---

to preserve anonymity, violation of the privacy rights of those identified in the records is de minimis. *See* Std. 5.6, Commentary at 86. Moreover, as the purpose of RCW 13.50.010(8) is to permit research for, in part, the public purpose of understanding and improving the system, any minor invasion of privacy interests must be weighed against the public benefit to be obtained from the research. *Cf. Hearst Corp. v. Hoppe,* 90 Wn.2d 123, 137–38, 580 P.2d 246 (1978) (balancing privacy interests against the public's interest in information disclosed under the public disclosure act, RCW 42.17).

WILLIAMS, C.J., STAFFORD, UTTER, DOLLIVER, DORE, DIM-
MICK, and PEARSON, JJ., and CUNNINGHAM, J. Pro Tem.,
concur.