## NOTICE:   SLIP OPINION
### (not the court's final written decision)

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In the Matter of the Welfare of:<br><br>O.C. and D.C.,<br><br><br><br>Minor children. | No. 56609-5-II<br><br>(consolidated with Nos.:<br>56619-2-II, 56612-5-II, 56639-7-II,<br>56642-7-II, 56649-4-II)<br><br>PUBLISHED OPINION |

GLASGOW, C.J.—Five-year-old OC went missing, and the Grays Harbor County Sheriff's Office filed several emergency motions, seeking access to dependency and juvenile court records related to OC and two of her siblings, BB-P and DC, in order to determine whether those records contained any information that might help locate OC. The juvenile court granted the motions.

OC's mother, JB, appeals the orders shortening time, ordering disclosure to the sheriff's office, and unsealing juvenile court files for BB-P, DC, and OC. The mother[1] argues that the sheriff's office lacked standing to request access to the records and that the juvenile court erred when it granted the motions.

We hold that the juvenile court did not err when it ordered the release of dependency court files to the sheriff's office. However, the juvenile court abused its discretion when it used language that purported to unseal those records. We reverse the portion of the court's order unsealing BB-P's, DC's, and OC's juvenile court records, but we otherwise affirm.

---

[1] We refer to JB as "the mother," AC as the "father," and JB and AC collectively as "the parents," throughout.

No. 56609-5-II

We remand for the trial court to amend its order removing any reference to unsealing OC's, DC's, and BB-P's dependency records. We note that to the extent the dependency court files contain transcripts of dependency hearings, those transcripts are not confidential or sealed. Finally, we decline the mother's invitation to adopt procedures for juvenile courts to address requests for their dependency court files in the future.

FACTS

I. BACKGROUND

A.     Prior Proceedings

JB is the mother of BB-P[2] (born in 2012), DC (born in 2015), OC (born in 2016), and JC (born in 2019). AC is the father of DC, OC, and JC. The Department of Children, Youth, and Families has been involved with the family since April 2013. Since 2013, the Department has received 11 intakes regarding the family, 8 of which have been screened in for allegations of domestic violence, physical abuse, parental drug use, and medical neglect. When an intake is "screened in," the Department conducts an investigation based on the allegations in the intake. Clerk's Papers (CP) (OC)[3] at 5. The Department does not followup with an investigation when an intake has been "screened out." CP (OC) at 5.

---

[2] The parties' briefing and juvenile court orders refer to BB. To better reflect the initials and for consistency with our commissioner's ruling, we use the initials BB-P.

[3] The mother designated separate clerk's papers for OC and DC. Citation to OC's documents will be referenced as "CP (OC)." References to DC's documents will be designated as "CP (DC)."

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 56609-5-II

In 2014, the mother participated in dependency proceedings for BB-P and BB-P was placed in out-of-home care. The mother engaged in services for substance abuse and domestic violence. In 2015, BB-P returned to the mother's care and the dependency case was dismissed.

DC had a developmental disability caused by a rare genetic syndrome that requires daily injections. DC was legally blind and did not sleep or eat well. In June 2017, the Department received an intake that the mother had unaddressed mental health issues and she was not accessing services for one-year-old DC. The intake was screened out.

One month later, the Department received an emergent intake that DC was not receiving proper medical care. The intake alleged that DC was not receiving her medication. The intake also alleged instances of domestic violence in the home and that the father used methamphetamine.

After an investigation, the Department filed dependency petitions for BB-P, DC, and OC. DC and OC were placed in out-of-home care, and BB-P was placed with his biological father. Both parents participated in various services, including chemical dependency services, domestic violence services, and parenting education. The parents also participated in medical training on the proper administration of DC's medication. Because the parents engaged with services and made progress, the Department returned DC and OC to their care in 2019 and closed their dependency cases. BB-P remained with his father.

In January 2021, the Department received an intake that stated OC had scratches and bruising on her face. The Department screened in the intake for an investigation, but both parents refused to cooperate.

In November 2021, the Department received three separate referrals in two days about the family. Specifically, there had been a fire at the family home for which emergency services were

3

No. 56609-5-II

not called and the family continued to reside in the home despite an insurance agent advising it was unsafe to do so. These referrals were screened out.

B.      OC's Disappearance

The following facts are reflected in a sworn 2021 dependency petition for OC and a sworn declaration from the sheriff's office. CP (OC) at 1-6, 12-14. In December 2021, the Department received an intake from OC's school. The mother reported to the school that OC had started a fire at the family home sometime in November 2021. School staff then visited the home on three occasions and did not see OC. When school staff asked DC about OC's whereabouts, DC replied, "[T]here is no [OC]." CP (OC) at 3. The school staff then contacted law enforcement, who began to investigate.

The parents told law enforcement that OC was with her paternal grandfather. However, when officers contacted the grandfather, he reported that he had not seen OC since Christmas 2020. The parents later reported to a police officer that they had "lost track" of OC between 5 and 10 days prior, in late November 2021, and the father then filed a formal missing person report in early December 2021. CP (OC) at 3-4.

Police arrested the parents for obstruction of a law enforcement investigation. Law enforcement also immediately placed OC's siblings in protective custody, and the Department filed new dependency petitions for DC, OC, and JC.[4]

The sheriff's office interviewed BB-P and DC as part of their investigation. DC stated that OC had started the house fire with the mother's torch and was subsequently beaten for it. DC also reported that OC was "under her mother's bed and in the woods." CP (OC) at 3. BB-P reported

---

[4] JC's dependency petition is not part of the record before this court.

4

No. 56609-5-II

that all four children were home at the time of the fire and that everyone made it out of the house except OC. BB-P additionally reported that the mother physically abused OC and JC and that OC was kept in a locked "cell" underneath the stairs. CP (OC) at 3. DC confirmed BB-P's statements regarding the mother's physical abuse of OC. DC further stated that OC and JC were not safe in the mother's care.

The sheriff's office obtained a warrant to search the family property for OC. The sheriff's office also contacted known relatives and former foster parents regarding OC's whereabouts. No one had information about OC.

## II. EMERGENCY MOTIONS

A.     Motions

The sheriff's office filed emergency motions in juvenile court under DC's and OC's open and closed dependency docket numbers: an ex parte motion to shorten time and a motion to unseal and disclose records. The trial court had before it the sworn dependency petition describing the facts as recited above.

The sheriff's office asked the juvenile court to "unseal records and provide such records, court filings and transcripts" from two of BB-P's closed dependency cases "for investigation purposes[] only." CP (OC) at 9. The sheriff's office stated that it was investigating "both the abandonment of the child [DC] and the whereabouts of the child [OC]." CP (OC) at 10. It also asserted, "Time is crucial and of the essence in obtaining all possible information for the investigation by law enforcement to locate [OC]." CP (DC) at 10. The sheriff's office cited RCW 13.50.010, which provides that records may be released for the purpose of investigating "'child

5

No. 56609-5-II

fatality, child physical abuse, and criminal neglect cases for the well-being of the child.'" *Id.* (quoting RCW 13.50.010(18)).

The sheriff's office supported its motion to unseal the records of all three children with the declaration of an officer who stated, "[DC] provided information . . . implicating her parents in [OC]'s disappearance." CP (OC) at 12. The declaration described evidence that DC had been deprived of essential medications for several months and asserted this constituted criminal abandonment of a dependent person. The declaration also emphasized that OC was missing and no family members could give information about her whereabouts. Time was of the essence because there was still hope that OC might be found alive and unharmed.

B.      Hearing

1.      The parties' arguments

At a hearing, the sheriff's office clarified that it was seeking the prior dependency records involving BB-P, DC, and OC from 2014 and 2017. The sheriff's office stated that it was seeking records under an order shortening time because OC had "not been located yet," so the search for her was urgent, and DC had a pending "abandonment criminal proceeding." Verbatim Rep. of Proc. (VRP) at 4. The sheriff's office explained that it anticipated the dependency records could lead to "enough information to research further people, places, and events" that could lead to OC's location. VRP at 16. The sheriff's office confirmed that the records would be used for investigative purposes only and would not be shared with third parties.

The Department did not oppose the motion to shorten time. It also stated that it intended to either join the sheriff's office motion to release records or file its own motion. The Department

6

No. 56609-5-II

explained that the sheriff's office was a juvenile justice or care agency, so it was "a proper agency to release records to." VRP at 5.

The mother opposed the sheriff's office motions, arguing that the sheriff's office did not have standing. She contended that the statutory authority referenced by the sheriff's office pertained to agency documents held by the Department, not juvenile court records. Finally, she asserted that the sheriff's office did not show how the sealed court records would assist with finding OC.

### 2. Juvenile court's ruling

The juvenile court found that it could address the merits of the motion to disclose the court records to the sheriff's office because the Department was joining the motions and the motions were in OC's best interest. The court granted the motion to shorten time because OC's disappearance was an "emergent situation." VRP at 7. The court confirmed that the Department had verbally joined the sheriff's motion, and it directed the Department to file a written motion as well.[5]

The juvenile court found that the sheriff's office "is a participant in the juvenile justice or care system" and therefore properly filed the motions to release and unseal the dependency records. CP (OC) at 16. The court found the request "for the release and unsealing of records and official juvenile court files, as defined by [RCW] 13.50.010(1)(c) & (d), [was] proper" because the sheriff's office was "investigating a case involving a missing and vulnerable child, [OC]," and the records from OC, DC, and BB-P's prior dependency cases were "reasonably certain to reveal relevant information necessary to enable law enforcement to locate [OC]." *Id.* Even though the

---

[5] There is no evidence in our record that the Department ever filed this written motion.

7

No. 56609-5-II

court mentioned "unsealing," the juvenile court made it clear in its oral ruling that the relevant dependency records could not be disclosed outside of the Attorney General's Office and the sheriff's office, and they could only be used in the investigation searching for OC.

The court's written order, entered under OC's open dependency cause number, stated that it applied to the "records, juvenile court files, and hearing transcripts" of all three children's open and closed dependency cases. CP (OC) at 16. The court thus ordered "the records, juvenile court files, and hearing transcripts" be "unsealed (if sealed) and copies provided to the Attorney General's [O]ffice for delivery to the Grays Harbor County Sheriff's Office for the purpose of furthering the investigation of the missing minor child, [OC]." *Id.* The order further provided that the "records shall not be used or shared for any other purpose than the investigation of the location of [OC], unless so ordered by the Court."[6] *Id.* The court also entered orders shortening time under both OC's and DC's open dependency case numbers.

The mother then sought discretionary review of the order to unseal records under OC's open and closed dependency cases. She also sought discretionary review of the order to shorten time under OC's and DC's open and closed dependency cases. We consolidated the mother's six notices of discretionary review and granted review of the "unsealing issue and all related records release issues" pursuant to RAP 2.3(b)(3) and 2.3(e).

ANALYSIS

I. STANDING

The parties do not dispute that the sheriff's office lacked standing to bring its motions in OC's and DC's open and closed dependency cases. The parties also do not dispute that the

---

[6] This provision is not challenged on appeal and remains in full force and effect.

8

No. 56609-5-II

Department has standing as a party to OC's and DC's dependency cases. The parties dispute whether the Department actually joined in the sheriff's office motions.

Here, the record shows that the Department made a joint oral motion with the sheriff's office for the release and unsealing of BB-P's, DC's, and OC's records. And the juvenile court treated the motion as the Department's motion. Because the Department had standing and made a motion for the release of records, the juvenile court did not err in addressing the merits of the motions.

II.    AUTHORITY TO RELEASE AGENCY RECORDS AND UNSEAL COURT RECORDS

A.    Law Governing Juvenile Justice and Care Agency Records Including Child Dependency Court Files

1.    Chapter 13.50 RCW presumption of confidentiality

Chapter 13.50 RCW governs the release of records by juvenile justice or care agencies, including the disclosure of juvenile court records. The procedures outlined in the statute are an exception to Washington Constitution article I, section 10, which provides for the open administration of justice. *In re Dependency of E.H.*, 191 Wn.2d 872, 897, 427 P.3d 587 (2018) ("article I, section 10 does not apply to juvenile records"); *State v. S.J.C.*, 183 Wn.2d 408, 422, 352 P.3d 749 (2015). Because the statute contravenes the constitutional presumption of openness, the statute is carefully drawn to balance the juvenile's interest in confidentiality with the public's interest in accountability and oversight. *See S.J.C.,* 183 Wn.2d at 432.

Juvenile justice or care agencies include law enforcement, juvenile and superior courts, the Attorney General's Office, and the Department of Children, Youth, and Families, among other entities. RCW 13.50.010(1)(b); *In re Dependency of G.A.R.*, 137 Wn. App. 1, 12, 150 P.3d 643 (2007). Chapter 13.50 RCW provides the exclusive means of obtaining access to juvenile justice

9

No. 56609-5-II

or care agency records, which are otherwise confidential. *Deer v. Dep't of Soc. & Health Servs.*, 122 Wn. App. 84, 92, 93 P.3d 195 (2004).

"Records" covered by chapter 13.50 RCW include "the official juvenile court file, the social file, and records of any other juvenile justice or care agency in the case." RCW 13.50.010(1)(d). Juvenile records that do not relate to the commission of juvenile offenses, like child dependency and parental termination court records, are governed by RCW 13.50.100 and "shall be confidential." RCW 13.50.100(2). Therefore, such records are presumptively sealed. *G.A.R.*, 137 Wn. App. at 11. Each juvenile justice or care agency must "implement procedures consistent with the provisions of this chapter to facilitate inquiries concerning records." RCW 13.50.010(4).

2.     Exceptions allowing the release of confidential records

Under RCW 13.50.100, a juvenile justice or care agency record that is otherwise sealed and confidential may nevertheless be released to certain entities under prescribed circumstances. *State v. Sanchez*, 177 Wn.2d 835, 849-50, 306 P.3d 935 (2013). Relevant here, RCW 13.50.100(3) provides that such records "may be released to other participants in the juvenile justice or care system only *when an investigation or case involving the juvenile in question is being pursued by the other participant* or when that other participant is assigned the responsibility of supervising the juvenile." (Emphasis added.)

Additionally, RCW 13.50.010(18) provides:

For the purpose of investigating . . . child fatality, child physical abuse, and criminal neglect cases for the well-being of the child, the [Department] may disclose only those confidential child welfare records that pertain to or may assist with such an investigation pursuant to RCW 26.44.180 and 26.44.175. The records retain their confidentiality pursuant to this chapter and federal law and cannot be further disclosed except as allowed under this chapter and federal law.

10

No. 56609-5-II

Thus, even when juvenile justice or care agency records, including child dependency court files, are shared for purposes of investigation, they cannot be further disclosed except as allowed by state or federal law.

There are several other circumstances where the legislature has authorized limited disclosure of juvenile justice or care agency records, including child dependency court records. For example, such records may be released for medical treatment and research purposes. RCW 13.50.010(8) permits the release of records to "any clinic, hospital, or agency which has the subject person under care or treatment," and to "individuals or agencies, including juvenile justice advisory committees . . . engaged in legitimate research for educational, scientific, or public purposes." In addition, the "administrative office of the courts shall maintain . . . cop[ies] of all records . . . for research purposes." RCW 13.50.010(12). Governmental agencies may access "juvenile records . . . for the purpose of carrying out research or data gathering functions." RCW 13.50.280(1). And, prosecutors and criminal justice agencies have access to "sealed juvenile records information." RCW 13.50.260(8)(c)-(d).

Although juvenile dependency court files are confidential and sealed, dependency hearings and transcripts of those hearings are presumptively open to the public. RCW 13.34.115(1); *see S.J.C.*, 183 Wn.2d at 431 ("The sealing statute does not remove juvenile proceedings from public observation."). Parties to a dependency hearing may move to close the hearing from the public, and the juvenile court shall close the hearing if it is determined to be in the best interest of the child. RCW 13.34.115(2). When a hearing has been closed, the juvenile court may also seal any recordings or transcripts of the hearing.

11

No. 56609-5-II

3.      Statutory interpretation principles

We review questions of statutory interpretation de novo. *PeaceHealth St. Joseph Med. Ctr. v. Dep't of Revenue*, 196 Wn.2d 1, 7, 468 P.3d 1056 (2020). "The object of statutory interpretation is to ascertain and carry out the legislature's intent." *Sanchez*, 177 Wn.2d at 842. Courts derive legislative intent from "the plain language of the statute, considering the text of the provision, the context of the statute, related provisions, amendments, and the statutory scheme as a whole." *PeaceHealth*, 196 Wn.2d at 8. Further, courts will "employ traditional rules of grammar" to discern a statute's plain language. *Id*. If there are any undefined terms, the term's plain and ordinary meaning applies. *Clark County v. Portland Vancouver Junction R.R.*, 17 Wn. App. 2d 289, 295, 485 P.3d 985 (2021).

B.      Authority to Release Dependency Records

1.      OC's records

RCW 13.50.100(3) allows juvenile courts to disclose records to other participants in the juvenile justice system, which include law enforcement, "*when an investigation or case involving the juvenile in question is being pursued by the other participant*." (Emphasis added.) The mother does not dispute that the trial court properly ordered OC's dependency records to be shared with the sheriff's office pursuant to RCW 13.50.100(3). We agree.

RCW 13.50.100(3) plainly allows a juvenile court to release records "to other participants in the juvenile justice or care system," including law enforcement, when they are conducting an investigation involving the juvenile whose records are being sought. Here, the juvenile court, the Department, and the sheriff's office are juvenile justice or care agencies. RCW 13.50.010(1)(b). At the time the sheriff's office requested OC's records, there was an active investigation involving

No. 56609-5-II

OC. Therefore, we hold the juvenile court properly ordered the release of OC's records to the sheriff's office.

2.     DC's and BB-P's records

The mother challenges the release of DC's and BB-P's juvenile court records to the sheriff's office because, she argues, there must be an active investigation involving the specific juvenile for which records are requested in order for one juvenile justice or care agency to release records to another. She contends that the juvenile court erred in releasing DC's and BB-P's records because the court's "oral ruling and written order make clear that the release of records in this case pertained only to the . . . investigation of [OC]." Br. of Pet'r at 33. She also contends there was not substantial evidence in the record to support the juvenile court's finding that information in OC's siblings' records was reasonably likely to assist in the investigation to locate OC. We disagree.

a.     Scope of an investigation "involving" the juvenile in question

RCW 13.50.100(3) allows juvenile courts to disclose records to other participants in the juvenile justice system, including law enforcement, "when an investigation or case *involving the juvenile in question* is being pursued by the other participant." (Emphasis added.) As the parties acknowledged at oral argument, "the juvenile in question" is the juvenile whose records are being requested.

The parties dispute whether the investigation of OC, a missing child, sufficiently "involved" OC's siblings to warrant release of their juvenile court dependency records to the sheriff's office. The mother asserts that the legislature's use of "the juvenile" and "the juvenile in question" "signifies that only one juvenile can be at issue at a time under RCW 13.50.100(3)," and the exception to the confidentiality requirement does not apply "to multiple juveniles who might

13

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 56609-5-II

happen to be tangentially involved or who might be subject to other investigations." Br. of Pet'r at 32. Therefore, according to the mother, only OC's records may be released as OC is both "the juvenile in question" and the juvenile being investigated. Br. of Pet'r at 32-33.

In contrast, the Department advocates for a broader reading and asserts that because the legislature referred to an investigation "involving" the juvenile whose records are being sought, rather than requiring that juvenile to be the "subject of" the investigation, the "[l]egislature intended to authorize the release of records to a law enforcement agency when the law enforcement agency is pursuing an investigation or case that broadly involves the juvenile in question." Br. of Resp't at 23.

We conclude that although a missing child's siblings may not be sufficiently involved in every case, DC and BB-P were sufficiently involved in the investigation of OC's whereabouts in this case to warrant the release of their records to the sheriff's office under RCW 13.50.100(3).

> b.       Plain meaning and context of the statute

Neither "involving" nor "the juvenile in question" is defined by the relevant chapter. *See* RCW 13.50.010, .100. When terms are undefined, we apply the terms' plain and ordinary meaning. *Portland R.R.*, 17 Wn. App. 2d at 295. Plain meaning may be discerned from the text of the provision and context of the statute. *PeaceHealth*, 196 Wn.2d at 7-8.

The plain language of the statute states that a juvenile justice or care agency's records, here the juvenile court's records, may be released "only when an investigation or case involving the juvenile in question is being pursued." RCW 13.50.100(3). "Records" is defined as "the official juvenile court file, the social file, and records of any other juvenile justice or care agency in the

14

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 56609-5-II

case." RCW 13.50.010(1)(d). The "official juvenile court file" includes the juvenile court's legal file containing a petition or information. RCW 13.50.010(1)(c).

The only reasonable reading of the statute is that the "juvenile in question" is the juvenile whose records are being sought. The issue is whether the investigation of OC's disappearance and the search for OC sufficiently *involved* OC's siblings.

Webster's Dictionary defines "involve" as "to draw in as a participant," "to relate closely," or "to have an effect on." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1191 (2002). As older siblings that were also in the mother's care and were present when the family's home burned, DC and BB-P were witnesses to events leading up to OC's disappearance. And because they were children in the same household during OC's childhood, DC's and BB-P's prior dependency records likely included information about the family's history, relationships, behavioral patterns, and circumstances that were also present for, or had an effect on, OC. For example, DC's and BB-P's records could include the names of people that OC spent time around, information about the family's dynamics, locations where the family previously lived or visited, or other details about their family life that could provide leads in OC's investigation. The records might contain information about how reliable the children were as reporters of what occurred in their home. This information could be particularly helpful in light of the parents' apparent indifference about OC's disappearance and their obstruction of the investigation. For these reasons, there was sufficient evidence to support the trial court's finding that information in DC's and BB-P's records was reasonably certain to reveal information relevant to the sheriff's office investigation.

The concurrence/dissent expresses concern that this analysis involves speculation about what information contained in DC's and BB-P's juvenile court files could be helpful to the

15

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 56609-5-II

investigation. Of course, without prior access to the requested records, law enforcement must speculate about what helpful information the requested records could contain. In these circumstances, the trial court certainly had discretion to conduct an in camera review of the requested records to determine whether they contained information that could be helpful in the search for OC. But law enforcement officers conducting the investigation were in a far better position to determine whether information in the requested records provided further avenues for investigation into OC's whereabouts because they had a comprehensive understanding of the investigation to date that the trial court did not have. Where the overriding concern was the location and rescue of OC, if she was still alive, the trial court also had discretion to release the requested records to law enforcement without prior in camera review under the plain language of RCW 13.50.100(3).

Reading chapter 13.50 RCW in context also supports a conclusion that the juvenile court was authorized to release DC's and BB-P's records to law enforcement in these circumstances. RCW 13.50.010(18) allows the release of "confidential child welfare records that pertain to or may assist with" an investigation of "child fatality, child physical abuse, and criminal neglect cases for the well-being of the child." In this case, the sheriff's office sought DC's and BB-P's records to assist with locating OC, who had been missing for at least three weeks at the time of the hearing, an urgent investigation whose purpose was to ensure OC's well-being. When discussing OC's whereabouts, DC said that "there is no [OC]" and that OC was "under her mother's bed and in the woods." CP (OC) at 3. BB-P said that the mother physically abused OC and JC and that OC was kept in a locked "cell" underneath the stairs. CP (OC) at 3. BB-P also said that OC did not make it out of the family home when it burned. DC confirmed BB-P's statements regarding the mother's

No. 56609-5-II

physical abuse of OC. The juvenile court specified that it was releasing the records on the "emergent basis" of locating OC, who remained "missing . . . and [was] extremely endangered." VRP at 8. In sum, the investigation was unquestionably one regarding a potential child fatality and child physical abuse, and the investigation was certainly to protect OC's well-being if she was still alive. In context, RCW 13.50.010(18) supports the conclusion that the legislature intended otherwise confidential juvenile justice and care agency records to be disclosed in these circumstances.

Further, while the "legislature has always treated juvenile court records as distinctive and as deserving of more confidentiality than other types of records," releasing DC's and BB-P's records to the sheriff's office did not contravene this principle. *S.J.C.*, 183 Wn.2d at 417. The statute allows "state criminal justice agencies" and staff from the "administrative office of the courts" access to "sealed juvenile records information" for research purposes. RCW 13.50.260(8)(c)-(d). In each of these situations, the records must remain confidential. RCW 13.50.010(8). The sheriff's office was similarly required to keep DC's and BB-P's records confidential pursuant to the court's order. It would be absurd to conclude that the legislature would authorize the release of confidential juvenile records to agencies like the administrative office of the courts for research but would not allow law enforcement access to the records of a missing five-year-old child's siblings, particularly when law enforcement stated that they could be helpful in locating the child.

As the juvenile court clarified, the purpose of releasing DC's and BB-P's records to the sheriff's office was "specifically and solely" to help find OC. VRP at 15. The trial court strictly limited the use of the records for that purpose alone and prohibited further disclosure of the records

No. 56609-5-II

for any other purpose. We conclude that under these facts, the trial court did not err when it ordered the disclosure of DC's and BB-P's records to the sheriff's office for the limited purpose of assisting with the investigation to locate OC.

C.     Authority to Unseal Records

1.     Unsealing of juvenile court records

The mother also argues that the juvenile court erred when it ordered BB-P's, DC's, and OC's juvenile court records be unsealed because it did not comply with GR 15(e)(4), which governs public access to sealed juvenile court records. The Department concedes that the juvenile court abused its discretion when it said it was unsealing these records because the court did not conduct a GR 15 analysis. We agree that unsealing would require compliance with GR 15, and we accept the Department's concession.

A "sealed record" is a record protected from examination by the public. GR 15(b)(4). GR 15 sets forth procedures for the "destruction, sealing, and redaction of court records" and "applies to all court records." GR 15(a). A "court record" includes "[a]ny document, information, exhibit, or other thing that is maintained by a court in connection with a judicial proceeding," along with any "official record of the proceedings." GR 31(c)(4). A court record does not include "information gathered, maintained, or stored by a government agency or other entity to which the court has access but which is not entered into the record." *Id.*

GR 15(e) provides the grounds and procedure for unsealing sealed records. The public may access a sealed record "only after the court records have been ordered unsealed pursuant to this section or after entry of a court order allowing access to a sealed court record." GR 15(e)(1). For juvenile proceedings, "[i]nspection of a sealed juvenile court record is permitted only by order of

18

No. 56609-5-II

the court upon motion made by the person who is the subject of the record," with limited exceptions not applicable in this case. GR 15(e)(4).

Here, in addition to requiring disclosure of the requested court dependency records to the sheriff's office, the juvenile court ordered that the "records [and] juvenile court files . . . shall be unsealed (if sealed)." CP (OC) at 16. But the juvenile court's order did not reference or apply GR 15(e). Instead, the order referenced only RCW 13.50.010 and RCW 13.50.100, which do not provide authority to unseal juvenile court records. Considering the juvenile court's entire decision in context, it is clear both from the written order and from the juvenile court's oral ruling that the court did not intend to unseal the records in the sense of allowing public access to the juvenile court files in question. Elsewhere in its order, the juvenile court expressly limited access to the Attorney General's Office and the sheriff's office, and the court strictly limited use of the records, ordering that they "shall not be used or shared for any other purpose than the investigation of the location of [OC], unless so ordered by the Court." CP (OC) at 16. Thus, in context, it appears the parties and the court referred to "unsealing" without appreciating its implications, namely that proper unsealing would permit public access to the records in question. Moreover, the parties and the juvenile court failed to apply the proper procedure for unsealing records.

To the extent that the juvenile court ordered BB-P's, DC's, and OC's juvenile court records to be "unsealed," we accept the State's concession that this was an abuse of discretion. Without proper application of GR 15(e), the court could not unseal BB-P's, DC's, and OC's juvenile court records. Accordingly, we reverse the portion of the order that purports to unseal BB-P's, DC's, and OC's records and juvenile court files.

19

No. 56609-5-II

2. Unsealing transcripts

The mother also argues that any transcripts from dependency hearings for BB-P, DC, and OC are "sealed and confidential" and, therefore, it was error for the juvenile court to unseal the transcripts. Br. of Pet'r at 21-27. The Department asserts that dependency hearings and transcripts are presumptively open to the public and there is no evidence in this record that any relevant transcripts were ever sealed. In a statement of additional authorities, the Department takes a more nuanced position, explaining that it believes any copies of dependency hearing transcripts that are contained in the official juvenile court file are not accessible to the public because of their placement in that file. In its order, the juvenile court purported to require the unsealing of any transcripts from dependency proceedings for BB-P, DC, and OC. However, there is nothing in the record before us that supports the mother's assertion that the dependency hearing transcripts for the three children were ever sealed pursuant to GR 15. Furthermore, the mother does not assert that the transcripts were sealed in a previous sealing hearing nor does she point to written findings or an order by a juvenile court sealing such documents. *See* GR 15(c)(1), (2); RCW 13.34.115(1); *G.A.R.*, 137 Wn. App. at 13 (holding that verbatim reports recorded in a public hearing are not sealed or confidential); *S.J.C.*, 183 Wn.2d at 431 ("[W]e remain committed to the statutory presumption that all juvenile court hearings are, and shall remain, open to the public."). Nor does our record establish whether any transcripts of dependency proceedings that occurred in open court were part of the official juvenile court file.

The mother argues that the language of RCW 13.50.010 and RCW 13.50.100 support her contention that the transcripts are sealed because they are part of the juvenile court file. But the legislature defined the contents of the confidential juvenile court file in RCW 13.50.010(1)(c) with

20

No. 56609-5-II

a lengthy and precise list, and it did not include transcripts or reports of proceedings. Absent a prior order specifically closing the dependency hearings to the public, making the recordings confidential under RCW 13.34.115, or sealing transcripts of the dependency hearings, such transcripts would not be confidential under chapter 13.50 RCW or sealed under GR 15.

We cannot determine from the record before us whether there are any transcripts from dependency proceedings for BB-P, DC, and OC; if so, whether they were previously sealed; or whether the proceedings from which any transcripts are made were closed to the public. Therefore, we remand to the juvenile court to determine whether any of the relevant dependency hearing transcripts were sealed pursuant to GR 15(c) or the hearings closed to the public pursuant to RCW 13.34.115(2). If the transcripts were sealed or the dependency hearings were closed, then the juvenile court erred when it unsealed the transcripts without applying GR 15(e). Otherwise, any transcripts of dependency hearings included in the dependency records are not sealed or confidential.[7]

### III. RECORDS RELEASE PROCEDURE

The mother asks that this court articulate additional procedures or criteria that juvenile justice or care agencies must meet in order to access records under chapter 13.50 RCW. She argues that juvenile justice and care agencies "should be prepared to demonstrate compliance with the Fourth Amendment to the United States Constitution and article I, section 7 [of the Washington

---

[7] On reconsideration, the State discusses a circumstance where a transcript of a dependency hearing or an excerpt of such a transcript could be attached to a motion, brief, or other document that the legislature has expressly listed as an item that is included in the definition of the "official juvenile court file" under RCW 13.50.010(1)(c). But because the parties have failed to establish that this occurred in this case, and because the Department's position has been a moving target, we decline to address this circumstance raised for the first time upon reconsideration.

21

No. 56609-5-II

State Constitution].” Br. of Pet'r at 35. She further asserts that when records are requested under RCW 13.50.100(3), “the courts should notify all interested parties and hold a hearing at which the parties may be heard before releasing such records.” Br. of Pet'r at 42.

We decline to adopt additional requirements for the release of juvenile court records because the juvenile court, not an appellate court, is in the best position to adopt procedures related to their own records.

A.      Requirement That Procedures Be Adopted

“[C]ourts may 'adopt any suitable mode of proceeding to carry out a statutory directive where none is specifically pointed out and jurisdiction is otherwise conferred upon the court.'” *In re Parentage of J.D.W.*, 14 Wn. App. 2d 388, 415, 471 P.3d 228 (2020) (quoting *Abad v. Cozza*, 128 Wn.2d 575, 588, 911 P.2d 376 (1996)). RCW 13.50.010(4) provides that “[e]ach juvenile justice or care agency shall implement procedures consistent with the provisions of this chapter to facilitate inquiries concerning records.” Juvenile and superior courts are the only courts that fall within the ambit of “juvenile justice or care agency.” *See* RCW 13.50.010(1)(b); *G.A.R.*, 137 Wn. App. at 12 (“[T]he statutory definitions of records and files under chapter 13.50 RCW refer only to the juvenile court and do not mention appellate records.”). Furthermore, the issue of when and whether access is granted to juvenile records should be determined by the juvenile court. *Seattle Times Co. v. County of Benton*, 99 Wn.2d 251, 262, 661 P.2d 964 (1983).

B.      Procedure for Releasing Records

As an initial matter, only juvenile and superior courts qualify as the “courts” contemplated within “juvenile justice and care agency.” Accordingly, RCW 13.50.010(4) and its directive to implement procedures consistent with chapter 13.50 RCW to facilitate inquiries concerning

22

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 56609-5-II

records do not apply to appellate courts. Therefore, this court does not have the authority under RCW 13.50.010(4) to adopt procedures regarding the release of juvenile court records. We therefore decline to adopt any new procedure to carry out the statutory directive. The juvenile court, as custodian of the juvenile court records, is in the best position to determine when and whether to release records to other juvenile justice and care agencies. *See id*.

The mother finally argues we should hold that due process requires "notice to all parties to the original action and to any person or entity affected by the request," before juvenile court records can be disclosed, citing to the *Mathews v. Elridge* factors. Br. of Pet'r at 48-49; *see Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976) (due process analysis considers the private interest affected by the action, the risk of an erroneous deprivation of that interest, and the probable value of additional procedural safeguards). Specifically, she argues that the risk of erroneous deprivation of juvenile confidentiality—particularly when records are shared with law enforcement—outweighs the government burden of providing notice all to affected parties.

But the mother did get notice and an opportunity to be heard in a hearing where she was represented by counsel. Thus, she cannot complain that she was deprived of due process, and to the extent she asks that we adopt procedural requirements for future cases, again, we decline.

In sum, we decline the mother's request to adopt additional requirements for release of records beyond what the legislature has statutorily required under chapter 13.50 RCW.

## CONCLUSION

We affirm the juvenile court's order permitting disclosure of OC's, DC's, and BB-P's juvenile court dependency records to the sheriff's office for the purpose of aiding in the

23

No. 56609-5-II

investigation of OC's disappearance. We reverse the language in the order purporting to unseal BB-P's, DC's, and OC's juvenile court records, and we remand for the trial court to remove the unsealing language from its order. We also conclude that any transcripts of dependency hearings that were not closed to the public are not sealed absent a sealing order from the juvenile court.

Finally, we decline to adopt additional procedures for disclosing confidential juvenile court records.

_____
Glasgow, C.J

I concur:

_____
Veljacic, J.

No. 56609-5-II

LEE, J. (concurring in part/dissenting in part) — I concur with the majority that the juvenile court did not err in addressing the merits of the motions before the court; properly ordered the release of OC's records to the Grays Harbor County Sheriff's Office; and erred in unsealing OC's, DC's, and BP-P's juvenile court records. I also concur with the majority with regard to the issue of unsealing the transcripts from dependency hearings for OC, DP, and BP-P, as well as the issue of adopting additional requirements or procedures for the release of juvenile court records.

However, I do not agree with the majority that the juvenile court properly ordered the release of DC's and BP-P's records to the sheriff's office. Where the majority and I depart is in how the phrase "involving the juvenile in question" is interpreted.

As noted by the majority, the parties dispute the meaning of the phrase "involving the juvenile in question" as it relates to what records can be released. The mother asserts that use of "the juvenile" and "the juvenile in question" "signifies that only one juvenile can be at issue at a time under RCW 13.50.100(3)," and "not to multiple juveniles who might happen to be tangentially involved or who might be subject to other investigations." Br. of Pet'r at 32. Therefore, according to the mother, only OC's records may be released as OC is the "'juvenile in question.'" Br. of Pet'r at 32-33. The mother further argues that we need not reach the question of whether DC and BP-P are "the juveniles in question" because the juvenile court determined the investigation related only to OC. Br. of Pet'r at 33. The Department of Children, Youth, and Families (Department) adopts a broader reading and asserts that because the legislature used the term "'involving'" rather than "'subject of'" when referencing "juvenile in question," the "[l]egislature intended to authorize the release of records to a law enforcement agency when the

25

No. 56609-5-II

law enforcement agency is pursuing an investigation or case that broadly involves the juvenile in question." Br. of Resp't at 23.

Because neither "involving" nor "the juvenile in question" are defined by the statute, we apply the terms' plain and ordinary meaning. *Clark County v. Portland Vancouver Junction R.R.*, 17 Wn. App. 2d 289, 295, 485 P.3d 985 (2021). Plain meaning may be discerned from the text of the provision and context of the statute. *PeaceHealth St. Joseph Med. Ctr. v. Dep't of Revenue*, 196 Wn.2d 1, 7-8, 468 P.3d 1056 (2020).

Here, the plain language of the statute states: "Records . . . may be released . . . only when an investigation or case involving the juvenile in question is being pursued." RCW 13.50.100(3). "Records" is defined as "the official juvenile court file, the social file, and records of any other juvenile justice or care agency in the case." RCW 13.50.010(1)(d). The "official juvenile court file" includes the juvenile court's legal file containing a petition or information. RCW 13.50.010(1)(c). The legislature has imposed an express limitation that "[e]ach petition or information filed with the court *may include only one juvenile*." RCW 13.50.010(2) (emphasis added). It follows, then, that the "records" within RCW 13.50.100(3) should pertain to only one juvenile—the juvenile in question. Moreover, RCW 13.50.100(3) does not state "involving *a* juvenile" or "involving *any* juvenile" who may be related to an investigation; the statute states "*the* juvenile." RCW 13.50.100(3) (emphasis added). Therefore, reading RCW 13.50.100(3) in the context of the entire statute, I would hold that only the records of "the juvenile in question" who is the subject of the investigation may be released. *See State v. Williams*, 136 Wn. App. 486, 493-94, 150 P.3d 111 (2007) (stating that use of "a" instead of "the" incorrectly stated and broadened the legal standard).

26

No. 56609-5-II

The Department's broad reading of RCW 13.50.100(3) should be rejected because "[t]he legislature has always treated juvenile court records as distinctive and as deserving of more confidentiality than other types of records;" therefore, the statute should be read narrowly in the interest of preserving a juvenile's confidentiality. *State v. S.J.C.*, 183 Wn.2d 408, 417, 352 P.3d 749 (2015). While OC's investigation may have "affected" or "concerned" DC and BP-P in that they are OC's siblings, to include DC's and BP-P's records for this reason alone would contravene the legislative intent of confidentiality of juvenile records. *See id.* Under the Department's broad interpretation, a juvenile justice or care agency—such as law enforcement—could potentially have unfettered access to records of any juvenile that the agency has deemed "involved" in an investigation of *another* juvenile, even if that involvement is minimal or irrelevant. The Department's broad reading of "involving," and the majority's adoption of that broad reading, risks defeating the confidentiality provisions of the statute.

The majority erroneously accepts the Department's broad reading of "involving" and relies on what DC's and BP-P's records would "likely include[]," "could include," or "might contain." Majority at 15. The majority's opinion allows courts to erroneously speculate on the contents of the records rather than focusing on whether the statutes allow for the release of juvenile records. That I cannot agree with.

The majority also claims that "law enforcement officers conducting the investigation were in a far better position to determine whether information in the requested records provided further avenues for investigation into OC's whereabouts." Majority at 16. The majority appears to miss the point. The issue is not who gets to determine whether information in the requested records would provide more information or who is in the best position to determine whether the

27

No. 56609-5-II

information in the requested records could further an investigation. Rather, the issue is whether the statute allows the release of confidential juvenile records.

With regard to the majority's reliance on RCW 13.50.010(18) as a basis for releasing DC's and BP-P's records, the record shows that the juvenile court did not cite to RCW 13.50.010(18) in its order as a basis for the release and unsealing of the children's juvenile court records. Regardless, the investigation at issue involved a missing child, not a child fatality, child physical abuse, or criminal neglect as required under RCW 13.50.010(18).

The majority relies on the exigency of the situation and that "the investigation was unquestionably one regarding a potential child fatality and child physical abuse." Majority at 17. However, the majority ignores the trial court's express ruling that it was releasing records because the sheriff's office was "investigating a case involving a *missing* and vulnerable child, O.C." and the requested records from prior dependency cases were "reasonably certain to reveal relevant information necessary to enable law enforcement to *locate* O.C." Clerk's Papers (CP) (OC) at 16 (emphasis added).[8] While I agree that there was much concern about OC's welfare and the trial court could have focused on the potential for child fatality and abuse in its order for the release of records, the trial court did not and instead expressly released DC's and BP-P's records based on its concern that OC was missing and needed to be located. It is not this court's role to ignore the record before us and to rewrite what the trial court ordered. By allowing the disclosure of confidential juvenile records under RCW 13.50.010(18) for investigations involving missing children, the majority reads words into the statute and the trial court's order that are not there. *See*

---

[8] The mother designated separate clerk's papers for OC and DC. Citation to OC's documents will be referenced as "CP (OC)." References to DC's documents will be designated as "CP (DC)."

28

No. 56609-5-II

*Progressive Animal Welfare Soc'y v. Univ. of Wash.*, 114 Wn.2d 677, 688, 790 P.2d 604 (1990) (courts may not read into a statute matters that are not in it).

Also, the majority relies on RCW 13.50.010(18) as authority for the juvenile court to share DC's and BP-P's juvenile court records with the sheriff's office. RCW 13.50.010(18) pertains to when *the Department* may share confidential agency records in cases of child abuse or child fatality investigations; thus, RCW 13.50.010(18) is inapplicable on the issue of whether *juvenile court records* can be released to a participant in the juvenile justice or care system. *See* RCW 13.50.010(18).

A.    DC's RECORDS

Here, the juvenile court released DC's records for the purpose of furthering the sheriff's investigation of a missing child, OC. In addition to the missing child investigation of OC, the sheriff's office had a separate investigation for the abandonment of DC and cited to DC's investigation as one of the reasons it requested the children's records.

Because there was an investigation involving DC, the juvenile court could have properly shared DC's records with the sheriff's office pursuant to RCW 13.50.100(3). The mother even appears to concede that had the juvenile court released DC's records for the purposes of DC's abandonment investigation, it would have had authority to do so. However, the juvenile court unequivocally stated that it was releasing records only "for the purpose of furthering the investigation of the missing minor child, O.C." CP (OC) at 16. Therefore, the juvenile court functionally denied the sheriff's request for records for the purposes of furthering DC's investigation. Because DC's investigation was not the basis for her record release, DC was not "the juvenile in question." Therefore, the juvenile court erred when it released DC's records.

29

No. 56609-5-II

B.      BB-P'S RECORDS

The sheriff's office filed motions for the release of BB-P's 2014 and 2017 dependency "records, court filings, and transcripts" under both OC's and DC's open and closed dependency case numbers. CP (OC) at 9; CP (DC) at 9. Even ignoring the fact that the sheriff's office requested BB-P's records under his siblings' case numbers, there was no active investigation regarding BB-P by any juvenile justice or care agency at the time of the motions. Therefore, BB-P is not "the juvenile in question." And the sheriff's office requested BB-P's dependency records from 2014, two years before OC was born, which would seem to have little, if anything, relevant to OC's investigation. Because BB-P is not "the juvenile in question" nor was there an investigation of BB-P, the juvenile court erred when it released BB-P's records.

For the reasons articulated above, I would interpret the phrase "involving the juvenile in question" in RCW 13.50.100(3) to only allow disclosure of records relating to the juvenile that is the subject of the investigation. Therefore, I would reverse the juvenile court's order releasing DC's and BP-P's records to the sheriff's office.

Lee, J.

30